### In re SOUTHERN ELECTRONICS COMPANY, INC., Debtor.

### Bankruptcy No. 3–81–01776.

United States Bankruptcy Court, E. D. Tennessee.

Sept. 17, 1982.

Adair & Goldthwaite, P. C., Patrick M. Scanlon, Deborah Greenfield, Atlanta, Ga., Barrett & Ray, P. C., George E. Barrett, Nashville, Tenn., for Communications Workers of America AFL–CIO.

Fowler & Rowntree, John H. Fowler, Knoxville, Tenn., for debtor.

Hunton & Williams, Benjamin C. Ackerly, Richmond, Va., for BVA Credit Corp.

## MEMORANDUM OPINION ON REJECTION OF COLLECTIVE BARGAINING AGREEMENT

CLIVE W. BARE, Bankruptcy Judge.

The issue before the court involves the debtor's proposed rejection of an executory contract pursuant to the provisions of 11 U.S.C.A. § 365(a) (1979).[1] The resolution of this issue involves competing interests and policies since the executory contract in question is a collective bargaining agreement. It is the duty of the court to

---

1. "Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract ... of the debtor."

accommodate these competing interests and policies, as codified in the Bankruptcy Code[2] and the National Labor Relations Act,[3] insofar as possible.

## I

The debtor, Southern Electronics Company, Inc., is a Tennessee corporation which owns and operates in the rural community of Mosheim in Eastern Tennessee a manufacturing plant, which is primarily engaged in the production of transformers and coils for use by electronics companies.[4] On November 20, 1981, the debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code and since that date has operated as debtor in possession. A proposed plan of reorganization and a disclosure statement were filed by the debtor on April 23, 1982. A section of the proposed plan of reorganization entitled "Provisions For Affirmation Of Executory Contracts" consists of the following paragraph:

The normal-course-of-business contracts entered into by the Debtors after 1981, or being performed by the Debtors at January 1, 1981, are affirmed, unless specifically rejected by the Debtors prior to confirmation or rejected by other provisions of the Plan. The debtor specifically rejects the union contract existing on the date of filing of the original petition herein between the debtor and Communications Workers of America dated September 23, 1980.

The "union contract" or collective bargaining agreement which the debtor proposes to reject is scheduled to expire at midnight on September 23, 1983.

The foregoing paragraph is repeated in each of the amended plans of reorganization which have been filed by the debtor.[5] The second sentence of the quoted paragraph is supplemented by the following language in the three amended plans of reorganization:

"and intends to operate as a non-union plant in the future subject to applicable law."

At the court's direction, this phrase was deleted in the Third Amended Plan of Reorganization As Modified, which was filed on August 9, 1982.

The debtor's disclosure statement includes a section entitled "The Debtor's Problems." According to the statements therein, the debtor's problems are partially attributable to ineffective management.[6] However, the debtor also evinces its dissatisfaction with its labor force by stating, in the same section of its disclosure statement, that:

Secondly, the productivity of the Debtor is poor and in the Debtor's opinion can be traced mainly to the mandatory provisions of the union contract. The Debtor believes that a combination of labor expense reduction and increased productivity without a union contract would result in total increase in gross profits of at least $150,000.00 per year. Therefore, the Debtor has proposed rejection of the union contract in the plan.[7]

On June 30, 1982, a hearing was held on confirmation of the debtor's plan, 11 U.S.

---

**2.** 11 U.S.C.A. § 101 *et seq.* (1979).

**3.** 29 U.S.C.A. § 151 *et seq.* (1973).

**4.** Southern Electronics Company, Inc., was incorporated in 1953 by Mr. Harold M. Detrick (deceased). Until June of 1982, the stock in the company was owned in the aggregate by the Detrick family. Also, until June 1, 1982, and for the past fifteen years or more, Mr. Harold J. Detrick, son of the founder, had been the chief executive officer of the company.

**5.** The debtor has filed three amended plans of reorganization and two motions to modify its Third Amended Plan.

**6.** The Company under the direction of Mr. Harold J. Detrick as chief operating officer has lost money for the prior three years amounting in the aggregate to a sum in excess of $500,-000.00. The debtor has continued to lose money while operating as a debtor in possession to at least a sum of $200,000.00.

**7.** During the past three year period the company had a work force of between 125 to 150

C.A. § 1129 (1979).[8] A second amended plan of reorganization was also filed on that date. After receiving some testimony on the debtor's financial condition and the interests of secured creditors, the hearing was adjourned until July 23, 1982.

At the hearing on June 30, 1982, the court inquired whether Communications Workers of America, (CWA), a signatory to the collective bargaining agreement which the debtor proposed to reject, had notice of the bankruptcy proceeding and the proposed rejection of the collective bargaining agreement. The court, not being satisfied with the debtor's response, directed the debtor's attorney forthwith to notify CWA of the proposed rejection of the collective bargaining agreement. Thereafter, counsel for the debtor submitted a letter dated July 1, 1982, to Gladys Jones, Secretary of CWA Local 10873, and enclosed a copy of at least a portion of the Second Amended Plan Of Reorganization of the debtor. The section of the proposed plan concerning the debtor's proposal to reject the union contract was enclosed with the correspondence, which was received on July 2, 1982, according to the affidavit of Gladys Jones, which was filed on July 23, 1982. Copies of the documents enclosed with the July 1, 1982, letter from the debtor's attorney were forwarded by Gladys Jones to a district office of CWA. Counsel for CWA did not receive copies of the documents until either July 12, or July 13, 1982.[9]

On July 20, 1982, the debtor filed its Third Amended Plan Of Reorganization. A grievance was filed by CWA Local 10873 on the same date against the debtor for an alleged violation of the collective bargaining agreement. On the following day, July 21, 1982, a grievance was filed by members of the local against the debtor. Each of these grievances was received by the debtor on July 21, 1982. Also, an unfair labor practice charge was filed with the National Labor Relations Board against the debtor by CWA on July 22, 1982.[10]

The foregoing facts are documented in the bankruptcy file in this case and are uncontroverted. The following findings of fact are made on the basis of the testimony offered at hearings held on July 23, August 9, and August 30, 1982.

1) Since the filing of the debtor's Chapter 11 petition, the capital stock of the debtor has been purchased by Gerard D. Henderson and his brother, Marty R. Henderson. On June 1, 1982, Gerard D. Henderson replaced Harold J. Detrick as president and chief operating officer of the debtor. Although the purchase of the debtor's stock is contingent upon the confirmation of a plan of reorganization which provides for the rejection of the collective bargaining agreement, a note evidencing the purchase price has been given to the former stockholders (Tr. I at 23).[11]

2) Gerard D. Henderson expects to invest "everything ... (he) can scrape up ... approximately $80,000.00 or $90,000.00" of his personal funds and his brother's funds in the debtor (Tr. I at 12).

3) The debtor desires to reject the collective bargaining agreement because it believes that the seniority provisions protect ineffective workers and because the union presence "prohibits the effective working" of Mr. Henderson's "participating management team" philosophy (Tr. I at 12, 35).

employees. At present, its production employees total 53.

**8.** The requirements of 11 U.S.C.A. § 1129 (1979) must be satisfied as a prerequisite to the confirmation of a debtor's reorganization plan by a bankruptcy court.

**9.** Counsel for CWA telephonically contacted the bankruptcy court office on July 13, 1982, to inquire about the debtor's case.

**10.** CWA alleges interference with the rights of employees under 29 U.S.C.A. § 157 and refusal by the debtor-employer to bargain collectively with the representative (CWA) of its employees to renegotiate the collective bargaining agreement. It is also alleged that the debtor violated the existing agreement by offering to recall certain employees without previously offering to recall employees with greater seniority.

**11.** Tr. I is the transcript of the July 23, 1982, hearing, whereas Tr. II refers to the transcript of the August 9, 1982, hearing. The transcript of the August 30, 1982, hearing is designated as Tr. III.

4) Gerard Henderson unequivocally testified that he does not propose to decrease the wages and benefits of the debtor's employees (Tr. I at 19). His attorney has likewise given the court the same assurance. This testimony negates the impact of the following statement in the debtor's Amended Disclosure Statement, prepared by former management and filed on May 28, 1982:

"In addition, should the Court approve rejection of the union contract, additional insurance costs of $30,000–$40,000 per year will be eliminated as these insurance payments are mandatory under said contract."

5) According to his testimony, Gerard D. Henderson intends to improve the physical facility where the debtor's employees manufacture transformers and coils by improving the lighting and installing air conditioning. He further testified that he expected to introduce a 25% profit sharing plan (Tr. II at 21).

6) The debtor is in the process of altering its product mix. When the debtor's reorganization petition was filed, the debtor was primarily producing coils, but the debtor anticipates that 95% of its production will be transformers before the end of the 1982 year (Tr. I at 6).

7) The testimony of Gerard Henderson on the subject of the cost of labor in the manufacture of the debtor's products is conflicting. On July 23, Mr. Henderson testified that labor accounted for 25–28% of production cost (Tr. I at 7). However, Mr. Henderson testified on August 9, 1982, that labor accounted for 35–40% of the debtor's cost of production (Tr. II at 12).

8) On an average, one of the debtor's employees can assemble or manufacture 125 transformers daily. Some workers are capable of producing more (Tr. I at 41–42).

9) Gerard D. Henderson and Billy L. Conduff, former plant general manager and now vice-president for manufacturing, testified on July 23, 1982, that 15 of the debtor's employees fail to meet 70% of the daily average production of 125 transformers and that 5 fail to meet 80% of this daily average (Tr. I at 16–17, 41).

10) One or more of the allegedly underproductive employees of the debtor is either a steward or an officer of the union (Tr. I at 42).

11) Not all of the underproductive employees are assigned to the task of making transformers. Indeed, "they're on several different jobs," according to Mr. Conduff (Tr. I at 47).

12) Article 12 (Seniority) of the collective bargaining agreement which the debtor proposes to reject provides in apposite part:

2. The Company reserves the right at any time and without considering seniority to move employees from job to job or from one operation to another within a classification, and to 'schedule' production operations . . . .

In the event of an increase or decrease of the work force, lay-offs, recalls, promotions, demotions or transfers or reassignments from one classification within the bargaining unit to another, plant wide seniority shall be considered along with the employee's *skills, ability, performance and physical fitness.* (Emphasis added.)

13) On July 2, 1982, R. Stanley Powell, East Tennessee Director for CWA, wrote to Gerard Henderson to remind him that CWA was still the exclusive bargaining agent of the debtor's employees and that the existing agreement between the parties was effective until the debtor gave notice of its desire to amend or modify the agreement through collective bargaining (Exh. 1). Mr. Henderson submitted this letter to his attorney, but there was no response thereto (Tr. I at 28).

14) In a subsequent telephone conversation on a date prior to July 23, 1982, but otherwise unknown, Gerard Henderson advised R. Stanley Powell that he did not want to engage in collective bargaining at that time (Tr. I at 28).

15) On July 27, 1982, R. Stanley Powell again wrote to Gerard Henderson. In his letter, Mr. Powell offered to negotiate with

the debtor on the issues of production standards and an employee participation program. Mr. Henderson replied by a letter dated July 29, 1982, wherein he expressed his willingness to meet with Mr. Powell.

16) Mr. Henderson and Mr. Powell met on August 4, 1982. Mr. Henderson requested a waiver of the seniority provisions of the collective bargaining agreement so that the debtor could dismiss approximately 15 purportedly underproductive employees. Mr. Powell advised Mr. Henderson that there must be some documentation of the employees' failure to meet production averages or goals prior to any waiver of seniority provisions of the agreement (Tr. II at 35). No written information was furnished to document the debtor's contentions of underproductivity on the part of the employees whom the debtor proposed to dismiss (Tr. II at 6–7).

17) During the August 4, 1982 meeting, Mr. Powell reminded Mr. Henderson that Articles 2 and 12 of the collective bargaining agreement permit the employer to set production standards and that the employer had not done so. Mr. Powell suggested that the debtor gather information on the alleged underproductivity of the employees in question over a period of time and told Mr. Henderson that he could terminate employees who did not meet the standards which could be set by management (Tr. II at 5–6). Mr. Henderson's response was that time was of the essence and that documentation would be too time-consuming (Tr. II at 36).[12]

18) No standards have been set for the debtor's production lines. Historical data from supervisors and Billy L. Conduff, former plant general manager, is used to establish production schedules [13] (Tr. II at 19).

19) The debtor's contention that it is losing $1,500 per day due to the underproduc-

tive employees is based on observations, and not documentation, of Gerard Henderson made while "pacing" the production plant (Tr. II at 17–18).

20) It is Mr. Henderson's testimony that the debtor will lose approximately $495,-000.00 in productivity over the next year if the debtor is required to continue to employ the allegedly underproductive employees (Tr. I at 17). This testimony is based on certain assumptions detailed in Exh. 2 which reflect that the debtor's *net* annual income would increase by the amount of $495,344.00 if each worker produced 125 transformers daily. The debtor's computations are based on a net profit of $2.75 per transformer whereas that is the sale price, not the profit. This assumption is thus entirely misleading because the debtor fails to deduct its costs of production.

21) The collective bargaining agreement includes a section outlining the grievance procedure. According to Billy L. Conduff, every discharge of an employee has been grieved but not all discharges have been arbitrated (Tr. I at 48–49).

22) There is little expense, apart from time, involved in connection with the internal grievance procedure. The debtor does not have any right under the collective bargaining agreement to have any issue arbitrated.

23) Mr. Henderson refused to meet with a CWA representative to bargain collectively prior to the July 23, 1982, hearing (Tr. I at 28–30). He advised Mr. Powell that he did not want to engage in collective bargaining "until the court had made its decision . . . ." (Tr. I at 28–29). Mr. Henderson's testimony is conflicting on the question of whether he will bargain collectively if the court does not permit the debtor to reject the contract (Tr. I at 29).

---

12. Mr. Henderson has testified that 90–120 days would be required to establish valid standards which would be recognized by an arbiter (Tr. II at 17).

13. This is an interesting statement considering the fact that the debtor is in the process of changing its product mix. 85–90% of its pro-

duction was coils when Mr. Henderson became president (Tr. II at 8). It is anticipated that 95% of its production will be transformers within the next 2–4 months. However, it is Mr. Henderson's testimony that the same basic dexterity is involved in assembling either a coil or a transformer (Tr. II at 9).

24) An Order was entered on August 2, 1982, requiring the debtor to abide by the collective bargaining agreement until further order of the court.

25) After the hearing on August 9, 1982, the debtor dismissed 14 [14] employees for low productivity and recalled 19 former employees from layoff. The recall was not undertaken in the order of seniority.

26) Each of the 14 employees who was dismissed after the August 9, 1982, hearing has filed a grievance against the debtor.

27) The debtor switched the 5 or 6 employees whom it contended cannot meet 80% of its production standard to other jobs at the plant (Tr. II at 15–16).

28) Since August 9, 1982, there have been two unsuccessful attempts by the debtor and CWA to bargain collectively for the purpose of renegotiating the collective bargaining agreement which the debtor proposes to reject.

29) Mr. Henderson will not negotiate further without the elimination of the grievances of the employees who have been discharged.

30) CWA has submitted a proposal to the debtor whereby production standards would be established and the employees who have been discharged would be afforded a trial period to determine if they can meet the production standards.[15] Any discharged employee who meets the production standard would be reinstated. Mr. Powell testified that he estimated that between six (6) and nine (9) months would be required to establish production standards. This proposal was rejected by the debtor in a letter dated August 21, 1982, from Gerard Henderson to Mr. Powell. The following language is quoted from the rejection letter:

The point of bargaining is Seniority. I do not concur with any contract that has a Seniority clause. That has been my position from the beginning and still is . . . . Therefore, I propose to you the following:

(i) The total destruction of the Seniority clause from the current contract. In fact, the elimination of the term "Seniority" from any part of the contract or any synonym thereof; and

(ii) The confirmation by the Union on the fourteen (14) dismissals, plus the dismissal of Nebraska Wilhoit.

This is the point from which I am bargaining, for as you know, my main desire is to operate in a union free environment. However, if the Union would like to agree to the above, I would entertain the Union within this facility.

31) Productivity at the debtor's plant has increased since the debtor discharged 14 employees on or about August 10, 1982, and recalled 19 employees who were on layoff, but the record in the case does not enable the court to determine whether factors aside from the composition of the work force have contributed to the increase in productivity.

32) The debtor introduced testimony through Mr. Henderson and a graph entitled "Dollars Shipped Per Working Employee" (Exh. 3) to evidence a substantial increase in that category. The graph may be interpreted to demonstrate that there was a substantial increase in dollars shipped per employee prior to the discharge of the underproductive employees. In any event, neither the graph nor Mr. Henderson's testimony establish that the discharged em-

14. One of the 15 purportedly underproductive employees, Nebraska P. Wilhoit, was previously dismissed on July 26, 1982.

15. The proposal is detailed in a letter dated August 20, 1982, which is addressed to Gerard D. Henderson and signed by R. Stanley Powell, East Tennessee Director for CWA. The proposal provides that the union will employ and pay an Industrial Engineer or a person with similar skills of its choosing to assist a counterpart selected by the debtor for the purpose of

establishing production standards. In the event of a failure to agree on the results of the joint undertaking, binding arbitration would be pursued. The debtor employer would have the exclusive right to lay off or recall employees and to assign work during the period of the development of the production standards and the trial periods for the discharged employees. They would be "feathered in," i.e., only a few of the discharged employees would simultaneously be reinstated for a trial period.

ployees failed to meet production standards, since external factors could have a direct influence on this measure (e.g., manufacture of different product, increase in orders shipped, or overtime).

33) Mr. Henderson testified on August 30, 1982, that the number of transformers assembled per employee had increased from an average of 59 for the month of June of 1982, to 112 for July, and 146 during August (Exh. 5). However, the record is silent on the question of whether the same amount of production time was expended during each of those three months for the production of transformers.

34) The average daily production of transformers has fluctuated significantly since on or about August 10, 1982, when some 14 employees were discharged and replaced by 19 employees with less seniority who had been laid off. This average was 166 during the first week with the different work force, but the average declined to 125 during the second week and then increased to 151 during the third week.

35) The number of in-house rejects of coils and transformers has declined since the second week of August when the debtor revised the composition of its work force by discharging 14 employees and replacing them with 19 former employees who have less seniority (Exh. 6 and Exh. 8).

36) The percentage of transformer in-house rejects before repairs was approximately 3½% during the month of July of 1982. That percentage decreased to approximately 1½% during the 3 weeks of production by the different work force (Exh. 8).

37) The accounts receivable of the debtor had increased at or about the end of August 1982 to approximately $184,000.00. This marked the first increase in the amount of the accounts receivable at the conclusion of any month since the debtor's Chapter 11 petition was filed on November 20, 1981.

38) There is no information in the record to document the average production of any particular employee of the debtor during any given period of time of production at the debtor's plant.

39) CWA has alleged that the debtor in possession has committed unfair labor practices and Gerard Henderson has denied the allegations thereof.

40) BVA Credit Corporation (BVA) has a first mortgage against the debtor's real estate and a first security interest in the debtor's accounts receivable, inventory, and equipment. Immediately upon the filing of the debtor's Chapter 11 petition, BVA requested "adequate protection" pursuant to 11 U.S.C.A. §§ 361, 363. On May 11, 1982, BVA commenced an adversary proceeding to obtain relief from the automatic stay of § 362 of the Code.

41) The total indebtedness of the debtor to BVA was $690,437.58 as of August 9, 1982. The fair market value of the real estate and equipment securing this indebtedness, which is also secured by $400,542.09 in accounts receivable and inventory, is disputed but it approximates $750,000.00.

42) The equity in the collateral securing the claim of BVA has continued to decline since the date of the debtor's petition in bankruptcy. The accounts receivable and inventory, according to BVA, have decreased as follows:

|  | Nov. 20, 1981 | July 31, 1982 | Decrease |
|---|---|---|---|
| ACCOUNTS RECEIVABLE | $311,560.33 | $ 97,686.41 [16] | $213,873.92 |
| INVENTORY | 458,487.15 | 302,855.68 | 155,631.47 |
| TOTAL | $770,047.48 | $400,542.09 | $369,505.39 |

43) The debtor proposes to secure a loan from First Tennessee Bank and to refinance a portion of the indebtedness to BVA, which will release its first security interest in the accounts receivable and inventory of the debtor in consideration of the payment of $350,000.00. The loan from First Tennessee Bank will be secured by a first secur-

16. According to the July monthly report of the debtor, its accounts receivable totaled $144,634.47 as of July 31, 1982. This figure exceeds the figure stated in an Exhibit of BVA and unchallenged by the debtor by the amount of $46,948.06.

ity interest in the accounts receivable and inventory released by BVA.

44) First Tennessee Bank has issued a commitment letter dated August 16, 1982. The bank will establish a revolving line of credit for the debtor whereby the debtor expects to borrow approximately $310,-000.00. This financing is conditioned upon the existence of sufficient operating capital after the payment of all payments due upon confirmation of the plan and confirmation of the Third Amended Plan Of Reorganization As Modified, which was filed by the debtor on August 9, 1982. That plan proposes to reject the debtor's collective bargaining agreement with CWA.

45) The sum of $150,000 will be available to the debtor from investors in addition to the $310,000.00 in loan proceeds from First Tennessee Bank for the purpose of reorganization and continuation of the debtor's business.

46) At the hearing on June 23, 1982, Gerard D. Henderson testified that rejection of the union contract is a condition precedent both to his personal guarantee of the anticipated loan from First Tennessee Bank (Tr. I at 25), and to obtaining a loan to refinance the indebtedness of the debtor to BVA.

47) The debtor had $396,000.00 in orders for its products as of August 30, 1982, and had outstanding quotations to prospective purchasers of its products in the amount of approximately $9,400,000.00 (Tr. III at 49).

48) There were 85–90 employees working at the debtor's manufacturing plant when the case was commenced (Tr. I at 50). This number has declined to approximately 54 at the present time. From its peak employ-

ment, 160 to 200 employees are presently laid off (Tr. I at 44).

49) The debtor's plan of reorganization provides for payment in full of two secured claims in an amount of approximately $775,000.00 and for payment in full of unsecured debts of approximately $650,000.00. The two secured creditors and a substantial majority of unsecured creditors voting on the plan have accepted the plan. Thus, there has been an "acceptance of the plan" by all classes of creditors. 11 U.S.C.A. § 1126(c) (1979).

## II

■ A debtor in bankruptcy, subject to court approval and to certain exceptions inapposite herein, may reject "any executory contract." 11 U.S.C.A. § 365(a) (1979).[17] This statutory right directly conflicts with some provisions of the National Labor Relations Act. 29 U.S.C.A. § 151 et seq. (1973).[18] The Second Circuit Court of Appeals was the first federal appellate court to consider the issue whether a collective bargaining agreement may be rejected by an employer which had filed a bankruptcy petition. The case in which the issue arose, Shopmen's Loc. U. No. 455 v. Kevin Steel Prod., Inc., 519 F.2d 698 (2d Cir. 1975), involved § 313(1)[19] of the Bankruptcy Act of 1898, which was previously codified at 11 U.S.C.A. §§ 1–1255 (1966).

Kevin Steel Products, Inc. was a debtor in possession under Chapter XI of the former Bankruptcy Act. The company was a party to three separate collective bargaining agreements. An unfair labor practice charge was filed by Shopmen's against Kevin Steel Products, Inc. three months prior to

---

**17.** Section 365(a) of the Bankruptcy Code provides that "the trustee, subject to the court's approval may assume or reject . . . ." However, a Chapter 11 debtor in possession, subject to limitations imposed by the court, has all the rights and powers of a trustee, with the exception of the right to compensation under § 330 of the Bankruptcy Code. 11 U.S.C.A. § 1107(a) (1979).

**18.** For instance, § 8(d) of the NLRA, 11 U.S.C.A. § 158(d) (1973), enacts a detailed procedure which an employer who is a party to a

collective bargaining agreement covering employees in an industry affecting commerce must follow if that employer desires to either modify or terminate the agreement.

**19.** This statute, which was formerly codified as 11 U.S.C.A. § 713 (1970), provided in part: "Upon the filing of a petition, the court may . . . (1) permit the rejection of executory contracts of the debtor, upon notice to the parties to such contracts and to such other parties as the court may designate . . . ."

the filing of the debtor's Chapter XI petition in bankruptcy. The National Labor Relations Board affirmed the finding of an administrative law judge that Kevin Steel Products, Inc. had violated the National Labor Relations Act. During the same month in which the NLRB affirmed the decision of the administrative law judge, a bankruptcy judge granted the request of the debtor in possession to reject the collective bargaining agreement with Shopmen's. (The debtor in possession did not seek to reject two other collective bargaining agreements.) The bankruptcy judge's decision permitting rejection was reversed by the district court judge. The appeal of the debtor in possession from that decision and the application of the NLRB for the enforcement of its order—that the debtor in possession did not comply with the NLRB order—were consolidated before the court of appeals.

The debtor in possession argued that Congress did not intend to afford protection to collective bargaining agreements aside from those involving railroad employees, whose wages or working conditions could not be modified by a bankruptcy court or trustee other than as permitted by the Railway Labor Act, 45 U.S.C.A. § 151 *et seq.* (1972). Congress had explicitly afforded protection to railroad employees covered by collective bargaining agreements by virtue of the enactment of former 11 U.S.C.A. § 205(m) (1946). This limitation of protection evidenced congressional intent to permit the rejection of other collective bargaining agreements, according to the debtor in possession. *Kevin Steel* at 702. The union countered by arguing that public policy considerations dictate a determination that a bankruptcy court does not have authority to permit rejection of collective bargaining agreements since there is an "enormous difference between a labor agreement

and an ordinary commercial contract." *Kevin Steel* at 702.

The Second Circuit held that rejection of a labor agreement under § 313(1) of the former Bankruptcy Act was permissible. The basis for the holding appears to be the court's understanding that a debtor in possession under Chapter XI is not the same entity as the pre-bankruptcy company and that the debtor in possession was simply not a party to the collective bargaining agreement which it sought to reject.[20] The court of appeals noted that requiring assumption of a collective bargaining agreement by a debtor in possession, a new entity, placed the new entity in a less favorable position than a successor employer, who, as a general rule, is not bound by an existing labor agreement. *See NLRB v. Burns Int'l. Security Services, Inc.,* 406 U.S. 272, 281–82, 92 S.Ct. 1571, 1579–1580, 32 L.Ed.2d 61 (1972). The case was remanded for consideration of the issue of whether rejection was properly granted.

The *Kevin Steel* court noted that an attempt should be made to accommodate the policies of the National Labor Relations Act and that rejection solely on the basis that rejection would improve the financial status of the debtor would be impermissible. *Kevin Steel* at 707. The court cited *In re Overseas National Airways, Inc.,* 238 F.Supp. 359 (E.D.N.Y.1965), for the proposition that rejection of a collective bargaining agreement should be allowed "only after thorough scrutiny, and a careful balancing of the equities on both sides . . . ."

Within a matter of weeks from the date of the decision in *Kevin Steel,* another panel of judges for the Second Circuit Court of Appeals held that a debtor in possession could reject executory collective bargaining agreements which were subject to the provisions of the Railway Labor Act[21] in the

---

**20.** In a decision subsequent to *Kevin Steel,* the Second Circuit Court of Appeals noted that its conclusion that a debtor in possession was not a party to the collective bargaining agreement could not be construed literally since one who is not a party to an agreement could obviously neither affirm nor reject the agreement. *Truck*

*Drivers Local Union No. 807 v. Bohack Corp.,* 541 F.2d 312, 320 (2d Cir. 1976).

**21.** Apparently, the REA employees involved were not railroad employees protected by the provisions of former 11 U.S.C.A. § 205(n) (1946).

case of *Brotherhood of Railway, Airline and Steamship Clerks v. REA Express, Inc.,* 523 F.2d 164 (2d Cir. 1975), *cert. denied,* 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388. The opinion concluded as follows:

> However, in view of the serious effects which rejection has on the carrier's employees it should be authorized only where it clearly appears to be the lesser of two evils and that, unless the agreement is rejected, the carrier will collapse and the employees will no longer have their jobs. Here the record fails to indicate clearly the extent to which agreement precludes continued operation of REA, the extent to which the district court weighed the conflicting equities .... Accordingly ... we remand the case to the district court for further consideration ... on the question of whether REA's agreements ... are sufficiently onerous and burdensome to warrant an authorization to the debtor-in-possession to reject them.

*REA Express,* 523 F.2d at 172.

### III

The decisions in *Kevin Steel* and *REA Express* involve the predecessor of § 365(a) of the Bankruptcy Code. However, it also has been held that a debtor may reject a collective bargaining agreement pursuant to 11 U.S.C.A. § 365(a) (1979). *In re Bildisco,* 682 F.2d 72 (3rd Cir. 1982); *In re Brada Miller Freight Systems, Inc.,* 16 B.R. 1002 (D.C.N.D.Ala.1981); *Matter of David A. Rosow, Inc.,* 9 B.R. 190 (Bkrtcy.D.Conn.1981). No case authority prohibiting rejection of a collective bargaining agreement by a debtor in bankruptcy as a matter of law has been cited by the parties hereto or discovered by the court.[22]

■ Although the authority of a bankruptcy court to permit rejection of a collective bargaining agreement under the Code is clear to this court, there is a division of authority on the question of the appropriate standard that should be applied before permitting such rejection.[23] The *Kevin Steel* decision suggests the importance of a "thorough scrutiny" of all of the facts and a "balancing of the equities." *REA Express* requires a more stringent standard; namely: Is the agreement which the debtor in bankruptcy seeks to reject so "onerous and burdensome" that the debtor will collapse if rejection is not permitted? There is also case authority holding that it is not incumbent upon a debtor to establish the burdensomeness of the collective bargaining agreement which he proposes to reject pursuant to § 365(a) of the Bankruptcy Code. *In re Ateco Equip., Inc.,* 18 B.R. 915; 8 Bankr.Ct. Dec. (CRR) 1159 (Bkrtcy.W.D.Pa.1982).

The issue of the appropriate standard to permit rejection of a collective bargaining agreement was recently discussed by Circuit Judge Aldisert in the case of *In re Bildisco, supra.* He rejected the more stringent test which would require establishing that the debtor will collapse if rejection is not allowed.[24] The basis for the rejection of the more stringent standard was twofold: (1) it might be impossible to determine the success or failure of a debtor's reorganization when rejection is sought; (2) more importance should not be attached to the perpetuation of the collective bargaining agreement than to the issue of whether

---

**22.** Additional cases holding that a collective bargaining agreement may be rejected pursuant to bankruptcy law are *Local Joint Executive Board v. Hotel Circle, Inc.,* 613 F.2d 210 (9th Cir. 1980); *Matter of Alan Wood Steel Co.,* 449 F.Supp. 165 (E.D.Pa.1978); *Carpenter's Local Union No. 2746 v. Turney Wood Products, Inc.,* 289 F.Supp. 143 (W.D.Ark.1968); *In re Klaber Brothers, Inc.,* 173 F.Supp. 83 (S.D.N.Y.1959).

**23.** This issue is reviewed in an article which was published prior to the decision of the Third Circuit Court of Appeals in the case of *In re*

*Bildisco,* 682 F.2d 72 (3rd Cir. 1982). See Note, *The Bankruptcy Law's Effect on Collective Bargaining Agreements,* 81 Colum.L.Rev. 391 (1981).

**24.** This standard has been applied in the following cases: *Brotherhood of Railway, Airline and Steamship Clerks v. REA Express, Inc.,* 523 F.2d 164 (2d Cir. 1975); *In re Brada Miller Freight Systems, Inc.,* 16 B.R. 1002 (D.C.N.D. Ala.1981); *Matter of Alan Wood Steel Co.,* 449 F.Supp. 165 (E.D.Pa.1978); *Matter of David A. Rosow, Inc.,* 9 B.R. 190 (Bkrtcy.D.Conn.1981).

the debtor's employees will continue to have jobs at all. Judge Aldisert noted that the approach advocated in *Kevin Steel,* i.e., "thorough scrutiny and a balancing of the equities on both sides" accommodates the interests of the employees covered by the collective bargaining agreement. His opinion provides in part:

We accept this formulation of the appropriate relationship between the competing statutory policies. It accommodates the statutory policies of the Labor Act by demanding a greater evidentiary showing than for rejection of a typical executory contract, but it does not erect impossible barriers to rejection of labor contracts .... It plots a middle course between the possible extremes, requiring a sensitive weighing of the competing private and public interests in the context of the particular case.

*In re Bildisco,* 682 F.2d at 79.

█ This court concurs in the decision of Judge Aldisert and agrees that after the debtor has met the test of "burdensomeness," *Kevin Steel* "provides the appropriate framework for an intelligent and equitable approach to the problem because it gives collective bargaining agreements a measure of protection beyond that available under the business judgment test without unduly advancing the interests served by the Labor Act over the other interests of the employees and those of the debtor's other creditors." *Bildisco,* 682 F.2d at 81.

## IV

The proposal of the debtor in possession to reject the collective bargaining agreement is not attributable to a desire to reduce either the wages or the benefits of the employees of Southern Electronics Company, Inc. There is no suggestion in the record that the present level of wages and benefits is either too costly to be sustained by the debtor or that those costs have forced the debtor into bankruptcy.

Instead, the debtor in possession objects to the seniority provisions of the collective bargaining agreement between the debtor and CWA. It is the contention of the debt-

or in possession that the seniority provisions of the agreement protect inefficient, unproductive employees. Specifically, Gerard Henderson testified on July 23, 1982, that fifteen (15) of the employees then working at Southern Electronics Company, Inc. failed to meet 70% of the daily average production of 125 transformers and that five (5) failed to meet 80% of this average. It is Henderson's contention that the purportedly underproductive employees are the proximate cause of the daily loss of $1,500.00 or more by the debtor and that the consequences of the continued employment of those employees will be a substantial monetary loss which will cause the collapse of the debtor. Additionally, Henderson has testified that the presence of a union inhibits his management technique of "employee participation."

After the hearing on August 9, 1982, Gerard Henderson discharged fourteen (14) employees whom he believed to be underproductive and replaced them with nineteen (19) former employees who had been laid off. Those recalled were not selected in order of their seniority. Grievances have been filed by CWA on behalf of the fourteen (14) employees who were discharged shortly after the conclusion of the August 9, 1982, hearing on the confirmation of the debtor's plan. Furthermore, it is reasonable to anticipate that additional grievances will be filed by laid-off employees who outranked those recalled on the seniority list of the debtor's employees.

Gerard Henderson has further testified that productivity has improved since the replacement of the purportedly underproductive employees. Exhibits have been received in connection with Henderson's testimony which reflect increases since the revision of the work force in: (1) the number of transformers produced per worker; (2) accounts receivable; (3) the amount of products in terms of dollars shipped per employee. However, the debtor has admittedly never established plant-wide production standards. Since the record is devoid of any evidence of individual production performance, there is no objective criteria

to enable the court to determine whether any of the employees discharged on or about August 9, 1982, were wrongfully discharged. This is particularly disturbing to this court since there is an obvious potential for arbitrariness or capriciousness on the part of an employer who is a party to a collective bargaining agreement.[25]

CWA argues that the debtor has failed to establish the burdensomeness of the collective bargaining agreement because there is no credible evidence to substantiate the debtor's assertion that disallowing the requested rejection will jeopardize the continued operation of the debtor's manufacturing plant. Although Gerard Henderson testified that the debtor does have production records which document the production of an employee during a production cycle (Tr. III at 39), those records were never made available to CWA (Tr. III at 61–62). Furthermore, these individual production records have not been offered as evidence by the debtor in possession and they are not a part of the record.

Article 12 (Seniority) of the collective bargaining agreement provides in part:

In the event of an increase or decrease of the work force, lay-offs, recalls, promotions, demotions or transfers or reassignments from one classification within the bargaining unit to another, plant wide seniority shall be considered along with the employee's skills, ability, performance and physical fitness. Where factors other than seniority are substantially equal in the judgment of the Company, seniority shall govern. If a grievance is filed with respect to the application or interpretation of this paragraph, the arbitrator, before ruling favorably to the grieving employee, must find that the Company acted arbitrarily or in bad faith in the exercise of its judgment.

It has been, and continues to be, the position of CWA that the seniority provisions of the collective bargaining agreement do not prohibit the debtor from replacing inefficient, unproductive employees. CWA has, however, requested that the debtor document its contentions that certain employees were underproductive.

CWA contends that the debtor in possession has accomplished precisely what it argued that it was precluded from doing by the provisions of the collective bargaining agreement, namely, the replacement of employees considered underproductive by recalled employees with less seniority selected by the debtor in possession without any apparent regard for seniority. CWA suggests that it is therefore unnecessary for the court to permit the debtor in possession to reject the collective bargaining agreement. However, each discharge by the debtor in possession has been grieved and a spate of grievances by laid-off employees having seniority to those recalled is a definite possibility.

Despite the absence of any conclusive evidence documenting the production of particular employees, there is some evidence, although admittedly meager, that the average productivity of the debtor's work force has improved since the discharge of employees with seniority over those recalled from layoff on or about August 10, 1982. The record does not reveal, however, whether the same amount of production time has been allotted for the production of transformers since August 10, 1982, as was allotted during June and July of 1982.[26] There is also evidence that there has been an appreciable decrease in the number of in-house rejects of coils and transformers since the replacement of the purportedly underproductive employees.

More importantly, settlement without arbitration of the existing post-petition grievances and any prospective grievances of laid-off employees having seniority who

**25.** Billy Conduff, the debtor's vice-president for manufacturing, testified that one or more of the employees considered to be underproductive is a union steward and that not all of the employees who were considered unproductive produced transformers.

**26.** Gerard Henderson testified that there had been very little overtime since the revision in the composition of the work force (Tr. III at 22).

were skipped over when 19 employees were recalled is very unlikely. There is little or no reason to expect an internal settlement of the dispute since the parties have not heretofore been able to achieve one. The reorganization effort of the debtor would definitely be hindered if its management personnel must afford time to the resolution of these grievances at the expense of their attention to other duties. Furthermore, since the terms of the collective bargaining agreement provide that each grievance which is arbitrated is to be handled separately, unless otherwise mutually agreed, the costs attendant to arbitration of the grievances could prohibit a successful reorganization of the debtor.[27]

Pursuant to the provisions of 11 U.S.C.A. § 365(g)(1) (1979), the rejection of an executory contract of a debtor in bankruptcy amounts to a breach of contract "immediately before the date of the filing of the petition." Thus, the debtor would not be subject to charges of unfair labor practices for post-petition conduct if the collective bargaining agreement is rejected. *Bildisco,* 682 F.2d at 84.

In its present, precarious financial condition the debtor needs the most productive workers it can employ and it simply cannot afford any additional expense. Resolution of the grievances pursuant to the provisions of the collective bargaining agreement would be burdensome absent an internal settlement, which simply is not going to occur under these circumstances. The court is compelled to conclude that the collective bargaining agreement is burdensome.

In balancing the equities between the debtor and the union, the paramount factor which militates in favor of permitting the rejection of the collective bargaining agreement is the continuation of the debtor's business as a going concern. The court is persuaded that the debtor has a reasonable prospect of successfully reorganizing under its new management. The debtor in possession had $396,000.00 in firm orders for its products as of August 30, 1982. Accounts receivable were expected to increase at the conclusion of a monthly reporting period (August) for the first time since the debtor's bankruptcy petition was filed. Productivity has also improved.

The purchase by Gerard Henderson and Marty R. Henderson, his brother, of the capital stock of the debtor is conditional. The personal guarantee of Gerard Henderson of the note to be executed in consideration of a loan in excess of $300,000.00 from the First Tennessee Bank and the procurement of that loan is also conditional. Each of these three events is conditioned upon the confirmation of a reorganization plan which permits Southern Electronics Company, Inc. to reject its collective bargaining agreement with CWA. Absent the occurrence of that condition precedent, the Hendersons will not be obligated to purchase the capital stock of the debtor. It is the sworn testimony of Gerard Henderson that rejection of the collective bargaining agreement is critical to the consummation of the plan of reorganization and to the procurement of funds required to refinance the debtor's obligations (Tr. I at 25).

The cessation of the debtor's manufacturing business and forced liquidation of its assets is almost a foregone conclusion if the debtor's plan is not confirmed. In the present economic climate, such a result would certainly be inimical to the interests of the employees of the debtor who are either presently working or have a reasonable prospect for returning to work.[28] The cessation of the debtor's manufacturing operation would also devastate the interests of the holders of unsecured claims. One of the alternatives in the debtor's plan permits the holder of an unsecured claim to elect to accept payment in full of the allowed amount of the unsecured claim, without interest, over a period of four years beginning two years after the effective date of the plan. Creditors have accepted the reorganization proposal by a substantial majori-

---

**27.** Of course, CWA may be willing to permit the consolidation of the grievances of its members for the purpose of arbitration. There is, however, no guarantee of such an agreement.

**28.** The debtor projects an increase of 25 in the number of its employees within the next calendar year.

ty. Liquidation at a forced sale of the debtor's assets would mean either a de minimis dividend or no dividend whatsoever for the holders of unsecured claims. Continued operation of the business is their only hope.

There are also factors in the record which militate in favor of denying the requested rejection of the collective bargaining agreement. Collective bargaining is a cornerstone of our national labor policy. An agreement between an employer and a representative of its employees is a bargained for exchange which serves to govern the relationship and attempts to reduce the strife between the parties to the agreement. Rejection of such an important agreement should not be permitted simply because it would be in the best interest of the debtor. A bankruptcy court must afford due regard to the significance of the agreement between the parties to a collective bargaining agreement.

The good faith or bad faith of the parties is also a factor to consider when weighing the equities. In this case, the debtor's petition in bankruptcy was filed on November 20, 1981. A plan of reorganization, which proposed to reject the collective bargaining agreement, and a disclosure statement were filed on April 23, 1982. At a hearing on June 30, 1982, the court raised the question of notice to CWA of the proposed rejection of the collective bargaining agreement. Since the court was unsatisfied with the response to its inquiry, the court instructed the debtor's attorney to forthwith notify CWA of the proposed rejection. Notice by virtue of a letter dated July 1, 1982, from the debtor's attorney was the initial notice to CWA of the proposed rejection.[29]

The debtor in possession refused to bargain with the union until after the conclusion of a hearing before this court on July 23, 1982. On that date, the court instructed the parties to continue to abide by the provisions of the collective bargaining agreement and to attempt to resolve their differences.

CWA has demonstrated a willingness to attempt to settle the dispute between itself and the debtor. CWA also proposed that production standards be established over a period of time by either an industrial engineer or a person with similar capabilities. The employees who have been discharged would be "feathered in" for a trial period and reinstated only if they met the established production standard. The debtor would have the exclusive right to lay off or recall employees during the period of the development of production standards and the trial period.

In contradistinction to the willingness of CWA to attempt to compromise the dispute, the debtor in possession has been intransigent in its position that a collective bargaining agreement which includes a seniority clause is unacceptable. The opposition of Gerard Henderson to the protection afforded to workers by seniority provisions in a collective bargaining agreement and his attitude toward the union are evident in the following passage from Henderson's letter of August 21, 1982, to R. Stanley Powell, East Tennessee District Director for CWA:

The point of bargaining is Seniority. I do not concur with any contract that has a Seniority clause. That has been my position from the beginning and still is .... Therefore, I propose to you the following:

(i) The total destruction of the Seniority clause from the current contract. In fact, the elimination of the term "Seniority" from any part of the contract or any synonym thereof; and

(ii) The confirmation by the Union on the fourteen (14) dismissals, plus the dismissal of Nebraska Wilhoit.

This is the point from which I am bargaining, for as you know, my main desire is to operate in a union free environment. However, if the Union would like to agree to the above, I would entertain the Union within this facility.

---

**29.** The debtor's failure to properly notify CWA is only slightly mitigated by the assertion of the debtor's attorney that he did not want to "take on" the union until a feasible plan could be proposed. Notice should have been given to CWA not later than April 23, 1982, in any event. Yet, the court is fully satisfied that the interests of the union have been forcefully and adequately presented since it learned of the proposed rejection of the contract.

I do believe that the employees of Southern Electronics would be better off without Union representation because that in itself creates a third party within an entity which should really be a one party entity.

I do feel that a union free environment is best for my style of management, which is people oriented, for I believe that the productive employee is the most valuable asset of any organization, and through a team type atmosphere this Company can survive. However, as is proven by statements you have made toward me, all you want to do is destroy the team concept and have two opposing forces. And, as indicated in your unwillingness to negotiate, you could not care less as to the survival of Southern Electronics in a union free environment or even in a union environment if you must give one inch. I have seen no compromise in your negotiations, only alternatives. Again, I state the Seniority clause and the fifteen (15) terminated employees must go if Southern Electronics is to survive.

Another factor which this court has considered is the fact that the debtor's financial plight is not entirely attributable to poor productivity. It is admitted in the disclosure statement of the debtor that a lack of control and effective management has contributed to the difficulties. Former management has been entirely replaced, however.

Finally, this court is particularly concerned about the absence or inadequacy of a remedy for any employee who may have been wrongfully discharged by the debtor in possession. Although such an employee may have a claim against the debtor for damages, a party confronted with the burden of proof might reasonably be expected to forego the pursuit of any cause of action. If rejection is not permitted, the grievance procedure should ideally culminate in the reinstatement of any employee who was wrongfully discharged. However, this assumption presupposes that the debtor will continue to operate and that there will be a job to which the employee may be reinstated. This assumption has no foundation, however, under the facts presented to this court.

Despite the significant factors which favor denying the proposed rejection of the collective bargaining agreement, they simply do not outweigh the fact that the court's rejection of the debtor's plan, including the provision to reject the collective bargaining agreement, will result in the immediate cessation of business by the debtor and a forced liquidation of its assets. The consequences will be the loss of all jobs and the elimination of any prospect of a meaningful repayment to unsecured claimants. Such a consequence is also obviously not in the best interest of the employees of the debtor who are presently working.[30] This court refuses to attach greater significance to the perpetuation of the collective bargaining agreement than to the interests of the employees covered by that very agreement who are presently working and the unsecured creditors of the debtor employer.

Although the court will confirm the debtor's plan providing for rejection of the collective bargaining agreement, the debtor may be required to collectively bargain with CWA as long as CWA is the bargaining representative of the debtor's employees. *Kevin Steel,* 519 F.2d at 704 and *Bildisco,* 682 F.2d at 83. Thus the curtain has not finally descended on the rights of the parties.

### V

(1) A debtor in possession may reject a collective bargaining agreement pursuant to the provisions of 11 U.S.C.A. § 365(a) (1979).

(2) The appropriate standard to determine whether a debtor in possession, which

---

**30.** The court recently received a petition signed by 39 employees of the debtor expressing confidence in the present management of the debtor and the desire to no longer be represented by CWA. This letter did not influence the court's decision in this case, however, and, of course, should not have been presented. See Interim Bankruptcy Rule 5001, which prohibits ex parte communications with the Bankruptcy Judge.

is a different entity from the debtor, should be permitted to reject a collective bargaining agreement requires a thorough scrutiny of the facts and a balancing of the equities. *In re Bildisco,* 682 F.2d 72 (3rd Cir. 1982); *Shopmen's Loc. U. No. 455 v. Kevin Steel Prod., Inc.,* 519 F.2d 698 (2d Cir. 1975).

(3) The collective bargaining agreement between the debtor and CWA is burdensome and may be rejected by the debtor in possession, considering the fact that the debtor's manufacturing operation will cease if rejection of the collective bargaining agreement is not permitted.

(4) The interests of the employees presently working and the interests of the unsecured creditors of the debtor outweigh the factors which favor the perpetuation of the collective bargaining agreement in this case.

(5) The debtor's Third Amended Plan Of Reorganization As Modified As Of August 30, 1982, will be confirmed.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 752.