**In re BLUE RIBBON TRANSPORTA-TION CO., INC., Debtor in Possession.**

**Bankruptcy No. 8300362.**

United States Bankruptcy Court, D. Rhode Island.

June 24, 1983.

784

John Earle, Breslin & Sweeney, Warwick, R.I., for debtor in possession.

Richard M. Peirce, Roberts, Carroll, Feldstein & Tucker, Inc., Providence, R.I., for the Union.

## ORDER CONDITIONALLY GRANTING DEBTOR IN POSSESSION'S MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENT

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

Heard on June 2 and 6, 1983 on the debtor in possession's motion pursuant to 11 U.S.C. § 365 to reject a contract styled "National Master Freight Agreement and New England Supplemental Freight Agreement" (the contract) entered into between Blue Ribbon Transportation Co., Inc. (the company) and Local 251, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the union). At issue is whether the company has shown: (1) that the continuation of the contract would be burdensome to the estate and (2) the facts are such that the Court upon balancing the competing equities should authorize rejection of the contract.

### FACTS

The relevant evidence, presented during a two day hearing, appears as follows:[1] Blue Ribbon Transportation Co., Inc. is a Rhode Island corporation engaged in the interstate and intrastate transportation of general commodities. Since 1935, the company has been a party to a succession of collective bargaining agreements with the Teamsters Union and is presently a party to such a contract effective for the period March 1, 1982 to March 31, 1985 (Debtor in Possession's Exhibit 7).

In 1979, Blue Ribbon employed 14 drivers. In October 1979 the union called a strike because of the company's failure to pay health and welfare benefits as provided by the collective bargaining agreement (Union Exhibit 5). Although the strike lasted for only eight days, the evidence also establishes that the principals closed down the business for 26 weeks. Finally in March 1980, the three owners had a meeting with 13 of the drivers at a pub in Pawtucket, after which some but not all of the drivers agreed to return to work at the contract pay rate, after making a number of significant concessions, including reduction to a 2 week vacation (vacations under the contract ranged from 2–5 weeks depending on longevity), and returning about $20.00 to the company for each pay period. Subsequently, another such meeting was held and it was represented by the owners that they could continue operations only if the drivers additionally agreed to: waive all paid vacations, cut out one-half of their paid holidays, and contribute $86.65 each pay period to fund the company's pension plan obligation and one-half the health and welfare plan. Even with these additional concessions, business continued to decline. On May 16, 1983 Blue Ribbon filed its petition for reorganization under Chapter 11 of the Bankruptcy Code. On that same day, the debtor in possession filed the instant motion to reject the union contract.

Robert Voyer, Lawrence Voyer and Louis Martin each own one-third of the stock of Blue Ribbon. They contend that the business will close in less than a month with a resulting loss of jobs if the contract is not

---

1. This decision constitutes the findings of fact and conclusions of law required by rule 752 of the Rules of Bankruptcy Procedure.

rejected, and attribute the company's poor financial position solely to the high cost of labor which, they allege, prohibits it from charging competitive rates in the industry. The union argues that the contract is nationwide and equitable, and attributes the company's problems to the excessive cost of management personnel.

## LAW

■ The statutory authority for the rejection of executory contracts is 11 U.S.C. § 365(a),[2] which provides:

> (a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

Case law clearly demonstrates that collective bargaining agreements are subject to rejection under § 365. *See Local Unions v. Brada Miller Freight System, Inc. (In re Brada Miller Freight System, Inc.),* 702 F.2d 890 (11th Cir.1983); *N.L.R.B. v. Bildisco (In re Bildisco),* 682 F.2d 72 (3rd Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 784, 74 L.Ed.2d 992 (1983). However, the usual business judgment test for rejection of an executory contract is not appropriate in cases where the federal policy concerning bankruptcy and reorganization is in conflict with the federal regulation of labor-management relations. *Shopman's Local 455, Int'l. Ass'n. of Bridge, Structural and Ornamental Iron Workers v. Kevin Steel Products, Inc. (In re Kevin Steel Products, Inc.),* 519 F.2d 698 (2d Cir.1975). The Court of Appeals for the Second Circuit adopted a standard allowing such rejection only after thorough scrutiny, and a careful balancing of the equities. *Kevin Steel,* 519 F.2d at 707. Only a few months later, the Second Circuit added the requirement that rejection is warranted only if the contract will thwart efforts to save a failing company from collapse. *Brotherhood of Railway, Airline and Steamship Clerks v. REA Ex-*

*press, Inc. (In re REA Express, Inc.),* 523 F.2d 164 (2d Cir.1975), *cert. denied,* 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975).

The most recent cases discussing the standard to be met in order to reject a collective bargaining agreement dismiss the more stringent requirements of *REA Express,* and adopt the *Kevin Steel* two-part test; i.e., the debtor in possession must: (1) demonstrate that the continuation of the contract would be burdensome to the estate, and (2) provide facts sufficient for the Court to weigh the competing equities in the case and make a determination in favor of rejection of the contract. *Brada Miller,* 702 F.2d at 899; *Bildisco,* 682 F.2d at 79–80. This is the test which we choose to apply.

### (1) Is the Contract Burdensome?

Nelson B. Cohn, a certified public accountant who has worked for Blue Ribbon since 1958, testified that in 1979 the company experienced a loss of $13,600, although cash intake from the sale of capital assets was $58,000. Capital sales netted $20,000 in 1980, and the company still suffered a $29,000 loss. In 1981 there was a slight profit of $5,400, but only because $16,500 was realized from the sale, again, of capital assets. Finally, in 1982 Blue Ribbon showed a $21,000 loss, even after capital sales which brought in $10,713 (Debtor in Possession Exhibits 1–4). Cohn further testified that the company's net worth in 1982 was $26,000 (down from $120,000 in 1979), and that in his opinion the labor contract, as the major business expense, is the cause of Blue Ribbon's financial problems. He stated that if losses continue the company will soon be out of business.

Robert Voyer, the president of Blue Ribbon, testified that the company has been suffering a steady decline in business for years, and that the loss for the first quarter of 1983 was $25,000. Based on his 45 years' experience with the company, he predicts that it can remain open only three more weeks, unless the Court authorizes rejection

---

**2.** 11 U.S.C. § 1107 provides that a "debtor in possession shall have all the rights, ... and shall perform all the functions and duties ... of a trustee serving in a case under this chapter."

of the contract. Lawrence Voyer, the secretary/treasurer of the company, testified that he is unable to offer rates which are competitive with other carriers, primarily because of the wages required to be paid to drivers under the contract, and in March 1983 he told the union business agent for Blue Ribbon that the business would close shortly if wages were not reduced. Louis Martin, vice-president of Blue Ribbon, recited a list of eight customers lost by Blue Ribbon to competitors in the last year, and attributed this to drivers' wages which must be figured into their freight rate.

■ The union argues that the contract wage rate is fair and points out that many other carriers operate using the same scale. According to the union, the impact of the contract wage clause on the company is minimal, since Blue Ribbon is not paying other benefits required under the contract anyway, and because under the contract wages will remain unchanged through March 1985. The argument that the contract is fair on a nationwide basis is irrelevant to the issue before us, i.e., is the contract burdensome to *this* debtor in possession?

■ Based on a review of the entire record, the steady decline in business since 1979, and in particular the present financial condition of the company, I find as a fact and conclude as a matter of law that the contract is burdensome to the estate.

### (2) Balancing the Equities.

■ In balancing the equities the Court should consider a number of factors, although because of the unique circumstances of each case, no hard and fast rules may be applied. *See Brada Miller,* 702 F.2d at 899; *Bildisco,* 682 F.2d at 80. These considerations include the likelihood of liquidation if the contract is not rejected, the possibility of liquidation even if rejection occurs, the effect of a strike if negotiations after a rejection are unsuccessful, the effect of employee claims which would arise if the con-

tract is rejected, a comparison of the covered employees' wages with others in the industry, and the good or bad faith of the parties in seeking to resolve their mutual problems. *Brada Miller,* 702 F.2d at 899–900.

From the evidence, notably the testimony of Blue Ribbon's three principals and its accountant, I find that if the debtor in possession is not permitted to reject the contract, the business will close within a matter of weeks, with the resulting loss of jobs by the drivers currently employed. This factor is often given great weight in favoring rejection of the contract. *See In re Southern Electronics Co., Inc.,* 23 B.R. 348 (Bkrtcy.E.D.Tenn.1982). It is apparent on the facts of this case, however, that if the contract is rejected, and modified, and if that is the only change which occurs, the business still will not survive. Although the labor contract is burdensome, there are management problems which equal or outweigh the labor problems. The management of the company consists of three shareholders, each drawing a salary of $600 per week.[3] Compare this—Kathleen Poirier, called as a witness in behalf of Blue Ribbon, testified that as president of Atlas Distribution Center, a small trucking company similar to Blue Ribbon, she essentially runs the business alone, with some help from her unsalaried father and truck-driver brother. Although the principals testified in detail as to extensive and necessary services performed by each of them, it is clear that Ms. Poirier, with some unspecified assistance from her retired father, accomplishes the same things for Atlas on a single salary which her company can afford to pay. Robert Voyer doesn't even work a full day, and we don't know about his brother and brother-in-law. Three salaried management persons in a business the size of Blue Ribbon, with Blue Ribbon's current financial problems, are excessive.

Also, the company contributes 100% to the health and welfare and pension plans

---

**3.** $600 per week reflects a pay cut taken by the owners 6–8 weeks prior to the hearing.

for management.[4] Additionally, Blue Ribbon is paying the cost and maintenance of seven company automobiles for the business and private use of the officers and their families.[5] These cars are used by the three owners, their wives, and even the Voyers' stepfather, whose deceased wife used to own the company. There are seven company gasoline credit cards which are used by the family, although Robert Voyer testified that as a cost cutting measure each card is now limited to nine gallons per week. These practices have no place in a business so close to the brink of financial collapse. Based on these facts, I find that the company's present and past financial difficulties are caused in considerable part by excessive management costs.

Another consideration is a comparison of the affected employees' pay with wages paid to other drivers in the industry. The debtor in possession presented two witnesses who manage comparable small trucking companies. One such company pays drivers $6.00 per hour; the other $8.00–$8.50 per hour, plus certain benefits. The union argues that there are between 60–65 companies in Rhode Island which are parties to the same contract, which pay the same $13.18 per hour, plus benefits, and which are surviving even in the face of deregulation.

The Court also notes that the company has not exhausted all of its administrative remedies prior to litigation. Although the contract which expired in 1982 included a procedure for instituting revisions (Union Exhibit 4, Article 39), Blue Ribbon made no attempt to modify the contract by that means. Blue Ribbon attributes this to lack of time, but that excuse loses all force in light of its own assertion that the company's financial difficulties have existed for years.

Finally, we must consider the good faith of the parties. I find that the company drivers have acted in good faith at all times relevant to this proceeding. As for Blue Ribbon, the fact that the petition was filed in order to avoid the contract is not bad faith per se. In this case the company is not seeking to rid itself of the union, and that is not its stated goal. It has bargained with the Teamsters union since 1935 and attempted to modify the contract as recently as March 1983. The union makes much of the fact that the company's memorandum in support of its motion to reject the contract states that its "primary purpose in filing the petition for relief is to seek the court's permission to reject the union contract." At hearing, counsel for the company backed off from this position somewhat, and represented that the statement in the memorandum was inaccurate. Although the purpose of the reorganization may have been ineptly phrased by counsel in his memorandum, based on this Court's observations it is reasonable to conclude that the purpose of this proceeding is not only to reject the union contract, but also to effect a successful reorganization by correcting *all* of the ills which have brought this debtor in possession before the Court, including but certainly not limited to a burdensome collective bargaining agreement.

## CONCLUSION AND ORDER

Based upon the discussion and findings above, we conclude that the contract is indeed burdensome, but also find that the company has failed to show after thorough scrutiny and a careful balancing of the equities that the contract should be rejected. The latter finding, of course, refers to the Court's concern with the top-heavy condition of the company with respect to management costs. It is not too late, however, and neither is it required that facts suffi-

---

4. One of the informal benefit reductions agreed to by the drivers in 1980 was their waiver of the company's contribution to the pension plan, while they picked up this expense. The drivers also pay one-half of their health and welfare contribution, all of which is to be paid by the company under the contract. (Debtor in possession's Exhibit 7 Art. 64.)

5. It is unclear whether the company pays the registration and insurance costs for all seven vehicles, or only for the five vehicles registered in Rhode Island.

cient to tip the scale in favor of rejection must originate with or be voluntary on the part of the company. Here, denial of rejection on the ground that Blue Ribbon has failed to demonstrate sufficient equitable conduct on its part, will not benefit either side—to the contrary, the company will shut down and the drivers will lose their jobs if rejection is denied. In this case it seems appropriate, although admittedly unorthodox, to impose upon the debtor in possession the following conditions, which, if implemented, would in my opinion constitute the equitable balance required to permit rejection of the contract:

1. Management salaries are to be temporarily, but immediately reduced from a total of $93,600 to $70,000 per year. We leave it to the three principals to decide whether to reduce the number of management employees or decrease the salaries of those presently employed.

2. The number of cars owned and maintained by Blue Ribbon is to be reduced to one, and that vehicle is to be used exclusively for company business. All gasoline credit cards shall be cancelled forthwith. Proceeds of this liquidation shall remain an asset of the debtor in possession.

3. The pro rata contribution by the company to the health and welfare and pension plans for management personnel shall not exceed the pro rata company contribution to the drivers' plans.

These conditions are not permanent, but rather are intended to provide the equitable balance required for the Court to grant the relief requested here. When (and if) business improves, these matters are subject to review. If the debtor in possession provides written assurance to the Court within 5 days that these conditions have been implemented, then its motion to reject the collective bargaining agreement is granted.[6] If no such assurance is provided, said motion is denied because the debtor

---

[6] If the debtor in possession is authorized to reject a collective bargaining agreement, it is still obligated to bargain with the union in an attempt to execute a new agreement. *Brada*

in possession has not demonstrated that the equities favor rejection.

*Miller,* 702 F.2d at 899; *In re Southern Electronics Co., Inc.,* 23 B.R. 348, 363 (Bkrtcy.E.D. Tenn.1982).