TUTTLE, Senior Circuit Judge:
I
A.
The controversy before us arises out of a clash between two important national policies: the rejuvenation of the bankrupt and the regulation of labor-management relationships through the collective bargaining mechanism. The narrow focus of the present case falls on an apparent conflict between the facial language of two statutes promulgating procedures for the termination of collective bargaining agreements, § 365(a) of the Bankruptcy Code, 11 U.S.C. § 365(a)[1], and § 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d).[2]
On this appeal, the appellant unions challenge the district court’s affirmance of the bankruptcy court’s holding that collective bargaining agreements are executory contracts subject to rejection with court approval under 11 U.S.C. § 365, a decision that enables a bankruptcy trustee/debtor-in-possession[3] to avoid the more burdensome termination provisions of the N.L.R.A. Assuming arguendo that collective bargaining agreements are subject to the termination provisions of the Bankruptcy Code, the unions also urge: (1) that the facts of the present case do not provide adequate justification for the rejection of the agreement and, (2) that the district court and the bankruptcy court applied an incorrect legal analysis to the facts in the present case.
B.
Brada Miller Freight Systems, Inc. (“the Company”), a wholly-owned subsidiary of Brada Miller, Inc., is a special commodities carrier principally engaged in trucking in the midwestern United States. It is a signatory to the “National Master Freight Agreement and Central States Area Iron and Steel and Special Commodity Rider” and the “National Master Freight Agreement and Central States Local Cartage Supplemental Agreement,” two collective bargaining agreements negotiated between the International Brotherhood of Teamsters *892 and an employer association to which Brada Miller belongs. These agreements were effective for the period April 1, 1979, to March 31, 1982.
The Company was acquired by Dean Cut-singer in January 1979, and its corporate headquarters was moved from Kokomo, Indiana to Birmingham, Alabama. At the time Cutsinger acquired the Company, it was profitably operating an average of 550 motorized units a day out of 29 terminals. In 1978, the Company generated daily gross revenues of $180,000.
Immediately after Cutsinger acquired the Company, a strike ensued which shut down Brada Miller’s operations for approximately four months. The effects of the strike and a slowdown in the automobile industry, the principal market of the Company, precipitated a gradual decline in the Company’s business. The Company showed a net operating loss of $188,000 for 1979, and, by the end of August 1980, the number of motorized units operated by the Company plummeted to 125.
In the summer of 1980, the Company, in an effort to stave off impending bankruptcy, implemented a number of cost-cutting measures. Non-essential personnel were laid off, and a number of miscellaneous operating expenses were decreased or eliminated. The Company also approached its creditors and attempted to defer the amounts due under various accounts payable and loan installments.
These actions, however, proved too little, too late. On August 1, 1980, the Company and its parent organization filed reorganization petitions under Chapter XI of Title 11 U.S.C. §§ 1101 et seq. in the bankruptcy court for the Northern District of Alabama. Brada Miller Freight Systems, Inc., continued to operate the Company as, a debtor-in-possession.[4]
Simultaneously with the filing of its bankruptcy petition, the Company took two additional actions which are relevant to this appeal. First, the Company requested that the court approve the Company’s rejection of its collective bargaining agreements pursuant to 11 U.S.C. § 365. In an ex parte order entered on August 5, 1980, four days after the filing of the petition, the court authorized the rejection, but subsequently set its order aside on a motion by the unions pending a formal hearing on August 28.
Second, the Company informed its terminal managers that the collective bargaining agreements with the Teamsters had been rejected, and the managers were ordered to execute independent contracts with individual drivers. Several Teamsters members chose to continue operations as independent contractors, but those members who refused were not assigned further work by the Company.
Prior to the time of the hearing on the rejection of the contracts, various Teamsters locals filed charges with the N.L.R.B. contending that certain conduct of the Company pursuant to the rejection of the collective bargaining agreements constituted unfair labor practices. Following separate investigations, both the Detroit and Indianapolis Regional Offices of the N.L. R.B. issued complaints against the Company. These complaints were consolidated for a December 8,1980, hearing in Indianapolis.
In addition to the above actions, the N.L. R.B., pursuant to its power under § 10(j) of the N.L.R.A., 29 U.S.C. § 160(j), sought an injunction from the U.S. District Court for the Southern District of Illinois to compel the Company to cease numerous alleged unfair labor practices. On December 4, the Company, alleging that the N.L.R.B. proceedings and the federal district court action unduly interfered with the Company’s continuing operations and its efforts to achieve reorganization, filed a motion in the bankruptcy court seeking a stay of all pending proceedings on the unfair labor practice charges. The bankruptcy court granted the stay following an informal hearing and set *893 the matter down for a formal hearing on December 11.
The bankruptcy court entered its findings on December 22, 1980. The bankruptcy court estimated that the Company’s “breakeven point”, i.e. the amount of gross revenues necessary for the Company to meet its operating expenses, was $102,000 daily for 1980. The court noted that throughout August and September of 1980, the daily gross receipts from operations were consistently less than $35,000 per day.
A large portion of the Company’s costs were its obligations under the collective bargaining agreements. The bankruptcy court found that these obligations, including wages for unionized employees, health insurance payments, pension fund payments, holiday time, vacation time, funeral and sick leave, subscription to the Motor Carriers’ Labor Advisory Council, and various paperwork, cost the Company approximately $32,000 per day. The Company’s remaining operating expenses equaled $70,-000 per day in 1980.
The court held that the Company’s attempt to reject its collective bargaining agreement was a proper exercise of the powers granted to a debtor-in-possession by 11 U.S.C. § 365. The court then concluded, “[TJhere is ample evidence to support the rejection of the Union Contract which existed prior to the petition and the said rejection is approved.” The court did not specify the precise facts on which it based this judgment or articulate the applicable legal test which might justify such a conclusion given the facts of the present case.[5]
The N.L.R.B. and the affected unions appealed the bankruptcy court’s order to the U.S. District Court for the Northern District of Alabama. The district court, inter alia, affirmed the bankruptcy court’s judgment- that collective bargaining agreements are subject to rejection under 11 U.S.C. § 365(a) and concluded that substantial evidence existed to support the bankruptcy court’s grant of the Company’s motion to reject. The court found that a denial of the motion to reject would likely have resulted in the collapse of Brada Miller and that the equities therefore weighed in favor of rejection; the court found that this evidence satisfied the two-pronged test for rejection promulgated in Shopmen’s Local Union No. 455 v. Kevin Steel Products, Inc., 519 F.2d 698 (2d Cir.1975) and Brotherhood of Railway, Airline, and Steamship Clerks v. REA Express, 523 F.2d 164 (2d Cir.1975), cert. denied 423 U.S. 1017, 1073, 96 S.Ct. 451, 855, 46 L.Ed.2d 389, 47 L.Ed.2d 82 (1975).[6]
II
A.
The preliminary issue facing this Court is whether the rejection/termination of a collective bargaining agreement by a debtor-in-possession is governed by the statutory scheme of § 8(d) of the N.L.R.A. or § 365 of the Bankruptcy Code.
Section 365(a) of the Bankruptcy Code provides in relevant part: “[A bankruptcy] trustee, subject to the court’s approval, may assume or reject any executory contract or unexpired lease of the debtor.” This section, designed to allow the trustee or debt- or-in-possession to escape burdensome obli *894 gations of the debtor and facilitate the “fresh start” envisioned by the Code’s reorganization provisions, is, for the purposes of this appeal, identical to § 313 of the Bankruptcy Act (11 U.S.C. § 713) (repealed).[7] Therefore, prior case law considering the relationship of § 313 and the N.L.R.A. is relevant to our disposition of this case.
Section 8(d) of the N.L.R.A. provides a detailed four-step process that a moving party must follow in order to terminate or modify a collective bargaining agreement.[8] Even if this procedure is complied with, a party to a collective bargaining agreement is subject to unfair labor practice charges if it breaches the terms of the agreement prior to the agreement’s expiration date.[9]
The unions in the present case do not argue that a collective bargaining agreement is not an “executory contract” as that term is commonly defined.[10] Rather, they urge that Congress, in enacting § 8(d), intended to carve out collective bargaining agreements as an exception to the unilateral rejection provisions of § 365. In support of this interpretation, the unions’ briefs discuss extensively the history of this nation’s labor laws, citing numerous instances of the Supreme Court’s and the Congress’ recognition of the critical role played by the collective bargaining process in the prevention of industrial strife and the smooth maintenance of U.S. commerce. However, despite the forceful arguments by counsel for the unions, we conclude that Congress intended collective bargaining agreements to be subject to unilateral rejection by the bankruptcy trustee (with the approval of the court) under § 365.
B.
Federal appellate courts previously considering this issue[11] have advanced a legal concept which largely avoids the necessity of accommodating the apparently conflicting language of § 365 and § 8(d). This concept, the so-called “new entity theory,” is based on the notion that a debtor-in-possession is not the same legal entity as the pre-bankruptcy company, but a “new entity ... with its own rights and duties, subject to the supervision of the bankruptcy court.” Kevin Steel, 519 F.2d at 704. Since this new entity is not a party to the collective bargaining agreement, it is not bound by the strictures of § 8(d) and is free to seek rejection of collective bargaining agreements subject only to the applicable legal test for rejection under § 365. These courts have likened the bankruptcy trustee to a successor employer; like a successor employer, the trustee is held only to a duty to negotiate with the collective bargaining unit and is not bound by the substantive terms of the prior agreement to which it was not a party.[12]
While the new entity theory is a useful analytical tool, this Court (along with numerous commentators)[13] is troubled by cer *895 tain conceptual inconsistencies which compel us to seek an alternative ground for the resolution of the statutory conflict. While we recognize that the debtor-in-possession may constitute a “new juridical entity” for some purposes,[14] we find the debtor-in-possession indistinguishable from the pre-bank-ruptcy corporation as far as concerns their respective obligations under the collective bargaining agreement and the labor laws that regulate the formation, existence, and termination of such agreements.
The most obvious problem with the new entity theory is the statutory requirement that a debtor-in-possession, purportedly not a party to contracts executed by the pre-bankruptcy corporation, apply to the bankruptcy court for approval of its rejection of a collective bargaining agreement. If Congress had intended that the debtor-in-possession be in no way bound by the contracts of the pre-bankruptcy entity, the statutory scheme could simply prescribe that the filing of the bankruptcy petition constitutes a breach of all executory contracts to which the debtor is a party and grant the trustee/debtor-in-possession discretionary power merely to assume, not reject, these contracts.[15]
Conversely, if a bankruptcy court refuses to allow a debtor-in-possession to reject a collective bargaining agreement, the debt- or-in-possession is bound retroactively to the agreement from the time of the filing of the petition;[16] yet, the proponents of the new entity concept have failed to articulate a legal theory which justifies binding a “non-party” to the agreement. In these circumstances, the new entity theory collides head on with the fact that a debtor-in-possession may be held accountable for breaches of the collective bargaining agreement committed in the time between the filing of the petition and the motion for rejection.[17]
In short, the viability of the new entity theory is contingent on the bankruptcy court’s granting of the debtor-in-possession’s motion to reject the collective bargaining agreement. Its fragility is all too apparent in contrary situations where the debtor-in-possession is compelled to comply with the terms of an existing collective bargaining agreement.
Perhaps recognizing some of the inherent faults of the new entity theory, the Second Circuit, its principal proponent, has attempted to restrict the theory’s application since its promulgation, in Kevin Steel and REA Express. In Matter of Unishops, Inc., 543 F.2d 1017, 1018-9 (2d Cir.1976), the court wrote:
We again caution that the language of [Kevin Steel] stating that “[a] debtor-in-possession under Chapter XI ... is not the same entity as the pre-bankruptcy company” should not be extended as a generalization in cases other than those involving labor collective bargaining agreements where the claim is that Section 8(d) of the [NLRA] ... precludes disaffirmance of the labor agreement in a Chapter XI proceeding without taking *896 the steps required under Section 8(a) of the Labor Act; or under the Railway Labor Act ...[18]
However, this constraining language does nothing to cure the problems with the theory; once it is determined that § 365 is applicable to collective bargaining agreements, we see no evidence of a distinction by Congress between collective bargaining agreements and ordinary executory contracts that would support the Second Circuit’s efforts to limit the theory’s applications. The more the theory is forcibly restricted to a particular legal situation, the more apparent becomes its character as a “legal fiction.”[19]
C.
Therefore, rather than sidestep the apparent clash between the relevant statutes by the application of a legal concept that seems not wholly satisfactory, this Court finds it more beneficial to recognize the conflict in the statutory language and attempt to reconcile the statutes in a manner which best effectuates the intent of Congress.
Our analysis begins with the wording of § 365. The appellant unions have failed to present the slightest indication that Congress intended “executory contracts” to be interpreted in other than its everyday meaning. Though we are constantly aware of the Supreme Court’s admonition that “a thing may be within the letter of the statute and yet not within the statute, because not within its spirit or the intention of its makers,”[20] a more persuasive showing is required to justify a variation from explicit Congressional dictates than has been made in the present case; this is especially true where, as here, critical federal policies of equal magnitude weigh on each side.
Our decision, however, does not rest merely on the facial language of the conflicting statutes. Like every federal court which has considered this issue, we are particularly persuaded by the existence of that portion of the Bankruptcy Code, 11 U.S.C. § 1167,[21] in which Congress specifically exempts collective bargaining agreements formed under the Railway Labor Act (45 U.S.C. § 151 et seq.) from the operation of § 365. As the Second Circuit noted in Kevin Steel, this action by Congress shows that “Congress knew how to remove labor agreements from the scope of a general power to reject executory contracts.” 618 F.2d at 704. The impact of Congress’ failure to exempt other types of collective bargaining agreements is strengthened by the numerous amendments of the bankruptcy and labor statutes,[22] particularly the recent over *897 haul of the bankruptcy laws which left untouched the narrow exemption for railway labor agreements.
Moreover, we must reject the unions’ contention that there is no rational basis on which to distinguish railway labor agreements from collective bargaining agreements in other industries. The mere existence of the Railway Labor Act demonstrates the unique status of labor relations in the railroad industry, a status frequently recognized by both Congress and the courts.[23]
Furthermore, though we do not fully accept the frequently made analogy between a debtor-in-possession and a successor employer, some of the factors behind the Supreme Court’s decision not to bind successor employers to the substantive terms of collective bargaining agreements created by prior management lend weight to our conclusion in this ease. As the Supreme Court noted in Burns, to bind a successor employer to the substantive terms of a collective bargaining agreement negotiated by its predecessor would often interfere with the alienability of business enterprises and therefore frustrate the most efficient use of the nation’s resources. 406 U.S. at 287-88, 92 S.Ct. at 1582. These same considerations apply with perhaps even greater force in the present context; if a corporation attempting to reorganize under Chapter XI is compelled to retain verbatim its pre-bank-ruptcy collective bargaining agreement, regardless of the degree to which the burdens imposed by the agreement contributed to the corporation’s demise, it would often be impossible to induce fresh management and capital to participate in the revitalization effort of a bankrupt enterprise.
We do not contemplate that Congress intended the ultimate fate of a corporation under Chapter XI to rest so largely in the hands of the company’s protected employees. There simply exist too many other critical interests, those of other employees, creditors, and shareholders, the protection of which provides the stimulus for the bankruptcy laws, for this Court to conclude that the collective bargaining agreement was meant to hold a stranglehold position, totally immune from the flexibility provided by § 365.
III
This is not to say, however, that the interests of employees subject to a collective bargaining agreement are not superior to the interests of other parties affected by a bankruptcy. The vital stake of this Nation in the encouragement and enforcement of these pacts between management and employees is so well-documented as not to require recitation here. But these interests find protection not in the inflexible position urged upon us by the unions in the present case, but in the test applied by the bankruptcy court in determining whether to allow the rejection of the collective bargaining agreement. It is this test to which we now turn.
A.
An ordinary commercial contract may be rejected by a bankruptcy trustee upon a showing that rejection would benefit the estate. 2 Collier on Bankruptcy 1365.03 (15th ed. 1981). However, this minimal burden is insufficient to protect the special rights accruing to employees under the federal labor laws.[24] Therefore, *898 courts have imposed a heavier burden on a debtor-in-possession attempting to reject a labor-management contract.
Kevin Steel was the first federal appellate decision to struggle with articulating a test which would provide adequate protection to employees victimized by the rejection of a collective bargaining agreement while not throwing up intractable roadblocks before a bankrupt company seeking the advantages of Chapter 11 reorganization. The Second Circuit in that case adopted the proposal advanced in In Re Overseas National Airways, Inc., 238 F.Supp. 359, 361 (E.D.N.Y.1965), that a bankruptcy court should approve rejection of a collective bargaining agreement “only after thorough scrutiny, and a careful balancing of the equities on both sides ...” Kevin Steel, 519 F.2d at 707. The court noted that a bankruptcy court must “move cautiously” in granting a motion to reject a collective bargaining agreement given the important labor interests involved. Id:
In REA Express, decided only a few months after Kevin Steel, a panel of the Second Circuit considered an appeal from a district court order granting a motion of the employer to reject a collective bargaining agreement negotiated under the Railway Labor Act. Though purporting to apply the balancing test proposed in Kevin Steel, the REA Express court tacked on the additional requirement that a bankruptcy court could allow the rejection of a collective bargaining agreement only if it “concludes that an onerous and burdensome ex-ecutory collective bargaining agreement will thwart efforts to save a failing [company] in bankruptcy from collapse ...” REA Express, 523 F.2d at 169. In other words,
regardless of the outcome of a court’s consideration of the interests of employees, unionized and non-unionized, creditors, and shareholders, a collective bargaining agreement could be rejected only if the financial obligations imposed by the agreement were determined to be the difference between successful reorganization and forced liquidation.
The discrepancy between these two tests went unrecognized until N.L.R.B. v. Bildis-co, 682 F.2d 72 (3d Cir.1982), cert, granted,
- U.S. -, 103 S.Ct. 784, 74 L.Ed.2d
992 (1983). Until this time most courts apparently accepted the REA Express test as merely a fuller articulation of the somewhat loosely-worded standard of Kevin Steel. Thus, most courts have required a debtor-in-possession to make a threshold showing that successful reorganization is contingent on rejection of the challenged collective bargaining agreement.[25]
In Bildisco, the Third Circuit noted the inconsistent language of the Kevin Steel and REA Express opinions and explicitly rejected the additional showing required by REA Express. 682 F.2d at 79. The Bildis-co court explained:
[The REA standard], in our view, goes well beyond the “balancing of equities” required by Kevin Steel. We reject this more stringent test for two discrete but related reasons: first, for the pragmatic reason that it may be impossible to predict the success vel non of a reorganization until very late in the arrangement proceedings; and second, for the prudential consideration that the imposition of such a test unduly exalts the perpetuation of the collective bargaining agree *899 ment over the more pragmatic consideration of whether the employees will continue to have jobs at all.
682 F.2d at 80.
We agree with the Bildisco court, particularly with regard to its latter conclusion that the test of REA Express imposes an excessive burden on the debtor-in-possession, one that subordinates the myriad of diverse interests at stake to a single issue: the ability of the debtor-in-possession to show by a preponderance of the evidence that forced liquidation is a certainty absent a rejection of the collective bargaining agreement. We find, as did the Bildisco court, that the Kevin Steel balancing of the equities test provides a more satisfactory accommodation of the conflicting interests at stake in a rejection proceeding.
The probability of a forced liquidation is only one factor (though an important one) in a court’s consideration of a motion to reject; the failure of a debtor-in-possession to carry the burden suggested by REA Express should not be so firmly dispositive of the various interests at stake in a reorganization proceeding. To elevate this single consideration to such a dominant and decisive position allows the issue of rejection to be settled without any consideration of the interests of other parties involved, a total abdication of the policies behind the bankruptcy laws.[26]
B.
Obviously each Chapter XI proceeding presents a unique set of circumstances. Hence, no hard-and-fast test may be applied in every case. There are, however, a number of factors which we think might properly be considered by a bankruptcy court addressing a motion to reject; while we do not pretend that the factors discussed below are necessarily exhaustive, we believe that these factors, if adequately considered, will strike an appropriate balance among the important policies at stake.
First, of course, is the possibility of liquidation, both with and without the rejection,[27] and the impact of liquidation on each of the parties involved. We do not envision a particularized consideration of the effect of liquidation on individual employees, creditors, and shareholders, but rather a weighing of the impact on these groups in the aggregate.[28] In calculating the probability of liquidation after the rejection of a collective bargaining agreement, the bankruptcy court should bear in mind that a debtor-in-possession, even after rejection, is compelled to bargain with an established bargaining unit in an attempt to execute a new collective bargaining agreement;[29] therefore, the impact of a potential strike on the debtor need also enter into the court’s calculus.[30]
Second, (and closely related to the first), a court should consider the claims that will *900 result from the rejection of a collective bargaining agreement, both in terms of the adequacy of relief for the employees and other claimants, and the impact of these claims on the debtor. This factor is especially important since many of the benefits received by employees under collective bargaining agreements are non-monetary and generally incapable of providing a basis for a damage award.[31] In considering both this factor and the previous one, a court may find it appropriate to treat employees covered by the collective bargaining agreement and non-covered employees as distinct groups, paying particular attention to the proportion of covered employees in the entire workforce of the bankrupt company.[32]
Third, the cost-spreading abilities of the parties must be considered in a resolution based on the equities. Certainly, a $50,000 loss to a group of employees averaging $20,-000 a year in salary may have a far more devastating impact than a $100,000 loss suffered by a group of large banks and other major creditors or by the debtor-employer itself. The consideration of this factor seems especially appropriate since it was the discrepancy in economic power between labor and management that provided the impetus behind the establishment of the labor law policies we now seek to preserve.[33]
Finally, the good (or bad) faith of the unions and the debtor in seeking to resolve their mutual dilemma might be examined by the bankruptcy court. For example, did the employer seek concessions from the unions prior to its attempt to reject the contract? If so, how cooperative was the union? The tone of past negotiations between the parties is also relevant in evaluating their behavior. We stop short of requiring that the parties commence the bargaining process prior to the granting of a motion to reject,[34] but we leave it to the discretion of the. bankruptcy court to require such bargaining after considering the likelihood of success, the potential length of the negotiations, and the impact of delay on the debt- or-employer.[35]
*901 In conclusion, we must address the fears expressed by the appellant unions in the present case that employers will enter Chapter XI and utilize the Section 365 mechanism for the sole purpose of escaping a union contract. It has long been held that such an abuse of the bankruptcy and labor laws will not be tolerated under any circumstances.[36] Therefore, regardless of the outcome of the balancing of the equities, a bankruptcy court must make an “explicit showing in the record that the debtors were not improperly motivated by a desire to rid themselves of the union” prior to allowing the rejection of a collective bargaining agreement. In Re Figure Flattery, Inc., 88 Lab.Cas. (CCH) ¶ 11,850 at 23,502 (S.D.N.Y.1980); Kevin Steel, 519 F.2d at 707.
In sum,
[T]he polestar is to do equity between claims which arise under the labor contract and other claims against the debtor; ... in this, the court must consider the rights of covered employees as supported by the national labor policy as well as the possible “sacrifices which other creditors are making” in the effort to bring about a successful reorganization, (citation omitted); and ... the court must make a reasoned determination that rejection of the labor contract will assist the debtor-in-possession or the trustee to achieve a satisfactory reorganization. We believe that particularly in a time of economic uncertainty and distress an analysis following this pattern provides more protection to both employer and employee than the test urged upon us by the union....
Bildisco, 682 F.2d at 81.
The judgment of the district court at No. 81-C-0432-S is VACATED and the case REMANDED to it with the direction of a further remand to the bankruptcy judge for reconsideration in light of the foregoing and in light of the disposition by the Supreme Court of Bildisco.[37]

. Section 365(a) provides in relevant part:
“[A] bankruptcy trustee ... subject to the court’s approval, may assume or reject any executory contract or unexpired lease of the debtor.”

. Section 8(d) of the NLRA provides in relevant part:
(d) ... where there is in effect a collective bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—
(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;
(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;
(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to meditate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and
(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later.
The remainder of Section 8(d) together with Section 8(a)(5) of the N.L.R.A. (29 U.S.C. § 158(a)(5)) provide that the failure of an employer to comply with the above conditions will constitute an unfair labor practice.

. Subject only to certain limitations not relevant to this case, a debtor-in-possession has all the rights and powers and is compelled to perform all the duties and functions as a bankruptcy trustee appointed under Chapter XI. (11 U.S.C. § 1107(a)). These powers include the right to operate the debtor’s business, 11 U.S.C. § 1108, and the right to reject or assume exec-utory contracts (11 U.S.C. § 365). In the present case, Brada Miller Freight Systems, Inc., continued to operate the company as a debtor-in-possession following the filing of the bankruptcy petition.

. See note 3, supra. Since the distinction between the pre-bankruptcy Company and the debtor-in-possession is a somewhat slippery concept on which this Court does not choose to rely (see discussion infra), we will continue for simplicity to refer to the debtor-in-possession as “the Company.”

. The bankruptcy court also decided that (1) it has powers coextensive with the N.L.R.B. to adjudicate unfair labor practices and that the Company was guilty of an unfair labor practice; (2) it is empowered to enjoin the administrative processes of the N.L.R.B.; and (3) it is empowered to enjoin, and accordingly enjoined, the Company’s employees from interfering with the Company’s business.

. The district court reversed the remainder of the bankruptcy court’s decision. The district court held that: (1) the bankruptcy court does not have concurrent jurisdiction with the N.L. R.B. to adjudicate and remedy unfair labor practices; (2) the bankruptcy court exceeded its authority and violated the anti-injunction provisions of the Norris-LaGuardia Act (29 U.S.C. §§ 101, 104) by enjoining concerted employee activity arising out of the dispute between Brada Miller and its employees; and (3) the bankruptcy court failed to apply the proper legal test when it stayed the N.L.R.B. proceedings without finding that the proceedings threatened the Company’s assets.
Brada Miller does not challenge these portions of the district court order on this appeal.

. Section 313 provided in relevant part: Upon the filing of a petition, the court may
(1) permit the rejection of executory contracts of the debtor upon notice to the parties to such contracts and to such other parties in interest as the court may designate ...

. See note 2, supra.

. Id.

. Black’s Law Dictionary (5th ed. 1979) defines “Executory Contract” as “A contract that has not as yet been fully completed or performed. A contract the obligation (performance) of which relates to the future.”

. Kevin Steel; REA Express; Local Joint Executive Board, AFL-CIO v. Hotel Circle, Inc., 613 F.2d 210 (9th Cir.1980); N.L.R.B. v. Bildis-co, 682 F.2d 72 (3d Cir.1982), cert. granted,U.S. -, 103 S.Ct. 784, 74 L.Ed.2d 992 (1983).

. For discussion of successor employers’ obligations, see N.L.R.B. v. Burns International Security Services, 406 U.S. 272, 287-88, 92 S.Ct. 1571, 1582, 32 L.Ed.2d 61 (1973).

. Countryman, Executory Contracts in Bankruptcy: Part II, 58 Minn.L.Rev. 479, 489 n. 215 (1974); Note, The Labor-Bankruptcy Conflict: Rejection of a Debtor’s Collective Bargaining Agreement, 80 Mich.L.Rev. 134, 137-12 (1981); Note, The Bankruptcy Laws Effect on Collective Bargaining Agreements, 81 Colum.L.Rev. 391, 404 (1981); Note, Bankruptcy Law-Labor Law-Rejection of Collective Bargaining Agreements as Executory Contracts in Bankruptcy, 22 Wayne L.Rev. 165 (1974).

. One obvious example is the broad powers granted to a debtor-in-possession under the bankruptcy laws.

. A statutory plan of this nature would differ in a critical manner from 11 U.S.C. § 365(g) which provides that “the rejection of an execu-tory contract or unexpired lease of the debtor constitutes a breach of such contract or release ... immediately before the date of the filing of the petition.” (Emphasis added). Under this statutory scheme, the breach resulting from the rejection is imputed to the pre-bankruptcy debtor, but the actual step that precipitates the breach must be taken by the trustee/debtor-in-possession with the permission of the court.

. Though the law in this area is somewhat unsettled, this result appears compelled as a matter of federal labor policy. If a debtor-in-possession is unable to meet the test for the rejection of a collective bargaining agreement (see discussion infra), it would clearly be inequitable to allow the debtor-in-possession to violate with impunity the substantive terms of the agreement in the time period between the filing of the bankruptcy petition and the motion to acquire approval of the rejection. This is especially true since the length of the period between these two events is controlled by the debtor-in-possession who has the burden of moving for assumption or rejection of the contract before the bankruptcy court.

. See note 16, supra.

. The Unishop court’s statement that it “again” cautions against broad application of the new entity theory apparently refers to the court’s opinion in Truck Drivers Local Union No. 807 v. Bohack Corp., 541 F.2d 312 (2d Cir.1976). There, the court concluded:
Of course, the statement that the debtor is not a “party,” and the analogy to the successor employer, cannot be taken literally since neither affirmance or rejection of the collective bargaining agreement would be possible by one not a party to it. See, Countryman, Executory Contracts in Bankruptcy: Part II, 56 Minn.L.Rev. 479, 489 n. 259 (1974).
Id. at 320.

. Note, Bankruptcy and the Rejection of Collective Bargaining Agreements, 51 Notre Dame Law. 819, 829 (1976).

. Holy Trinity Church v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1891).

. Section 1167 provides in relevant part:
Notwithstanding section 365 of this Title, neither the court nor the trustee may change the wages or working conditions of employees of the debtor established by a collective bargaining agreement that is subject to the Railway Labor Act (45 U.S.C. 151 et seq.) except in accordance with section 6 of such Act (45 U.S.C. 156).
This section of the new Bankruptcy Code is substantially similar to section 77(n) of the Bankruptcy Act (11 U.S.C. § 205(n) (repealed)) which provided:
No judge or trustee acting under this Title shall change the wages or working conditions of railroad employees except in the manner proscribed in sections 151 to 163 of Title 45

. E.g., amending the National Labor Relations Act: the Taft-Hartley Act, June 23, 1947, ch. 120, 61 Stat. 136; the Landrum-Griffin Act, Sept. 14, 1959, Pub.L. No. 86-257, 73 Stat. 519; amending the Bankruptcy Act: Act of July 1, 1946, ch. 532, 60 Stat. 409; Act of Sept. 25, 1962, Pub.L. No. 87-681, 76 Stat. 570; Acts of *897 Nov. 28, 1967, Pub.L. No. 90-156, 90-157, 90-158, 81 Stat. 510, 511, 516; Act of Oct. 19, 1970, Pub.L. No. 91-467, 84 Stat. 990.

. For example, a House Report issued in conjunction with 11 U.S.C. § 1167 wrote, “The subject of railway labor is too delicate and has too long a history for this Code to upset established relationships. [Section 1167] continues this balance unchanged.” H.R.Rep. No. 95-595, 95th Cong., 1st Sess., p. 423 (1977), U.S. Code Cong. & Admin.News 1978, p. 5787, 6379. See also, International Association of Machinists v. Central Airlines, Inc., 372 U.S. 682, 687-89, 83 S.Ct. 956, 959-61, 10 L.Ed.2d 67 (1963).

. Kevin Steel, 519 F.2d at 707 (“The decision to allow rejection should not be based solely on whether it will improve the financial status of the debtor. Such a narrow approach totally ignores the policies of the Labor Act and makes no attempt to accommodate to them.”). The Kevin Steel court also recognized that employees require special protection since many of the *898 benefits accruing to them under collective bargaining agreements are “incapable of forming the basis of a provable claim for money damages.” Id., quoting In Re Overseas National Airlines, 238 F.Supp. 359, 361 (E.D.N.Y.1965). Therefore, the cause of action for a breach of contract provided to non-debtor parties to a rejected contract under 11 U.S.C. § 365(g) will seldom compensate employees fully for their losses when a collective bargaining agreement is rejected.

. See, e.g., In Re Alan Wood Steel Co., 449 F.Supp. 165, 169 (E.D.Pa.1978); In Re Miles Machinery, No. 81-00388 (Bankr.E.D.Mich. June 17, 1982), Slip op. 4-5; In Re Connecticut Celery Co., 106 L.R.R.M. (BNA) 2847, 2851-53 (Bankr.D.Conn.1980); In Re Studio Eight Lighting, Inc., 91 L.R.R.M. (BNA) 2429, 2430 (E.D.N.Y.1976).

. We do not mean to suggest that the possibility of liquidation may not constitute the most critical element of a bankruptcy court’s decision to grant or deny a motion to reject a collective bargaining agreement; in many instances, the threat of liquidation with its incumbent loss of jobs and default on debts will properly constitute the principal factor in.' a judge’s decision to allow rejection. We mean only to stress that this factor alone should not be decisive absent some consideration of the other interests involved.

. Though we recognize that consideration of this factor imposes a burden of prescience on a bankruptcy court similar to that decried in Bil-disco, we do not find this burden to be overly onerous under our proposed test where the ' possibility of liquidation is only one of a number of factors to be considered and is not necessarily dispositive of a particular case.
The bankruptcy court must keep in mind that many of the costs incumbent on the employer under the collective bargaining agreement will continue to be borne by the post-bankruptcy company. Therefore, in calculating the burden imposed on the debtor by a collective bargaining agreement, the court must estimate the surplus of costs under the collective bargaining agreement over the expenses that must continue to be met in the operation of the Chapter XI company.

. A comparison of wage and benefit levels of similarly-situated employees in other companies may be appropriate in this determination.

. Bildisco, 682 F.2d at 80; Kevin Steel, 519 F.2d at 704.

. Bildisco, 682 F.2d at 80.

. See note 24, supra. These types of intangible, non-compensable benefits may include pension rights, welfare rights, seniority rights, scope of work, union shop checkoff and discharges, disciplinary grievance/arbitration procedures, meal periods, jury duty, and uniforms. Note, 81 Colum.L.Rev. at 396 n. 52.

. Note, 81 Colum.L.Rev. at 401-403.

. As the Supreme Court noted in NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937):
[The NLRA] goes no further than to safeguard the right of employees to self-organization and to select representatives of their own choosing for collective bargaining or other mutual protection without restraint or coercion by their employer.
That is a fundamental right. Employees have as clear a right to organize and select their own representatives for lawful purposes as the respondent has to organize its business and select its own officers and agents. Discrimination and coercion to prevent the free exercise of the right of employees to self-organization and representation is a proper subject for condemnation by competent legislative authority. Long ago we stated the reason for labor organizations. We said that they were organized out of the necessities of the situation; that a single employee was helpless in dealing with an employer; that he was dependent ordinarily on his daily wage for the maintenance of himself and his family; that if the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and resist arbitrary and unfair treatment; that union was essential to give laborers opportunity to deal on an equality with their employer.
301 U.S. at 33, 57 S.Ct. at 622.

. This proposal was advanced in In Re Price Chopper Supermarkets, 19 B.R. 462, 466 (Bkrtcy.S.D.Cal.1982) and in Note, 80 Mich.L. Rev. at 149-52.

. Some confusion exists as to the proper role in a bankruptcy court’s decision of the profitability of other companies operating under the same collective bargaining agreement. We do not find this factor particularly relevant since it focuses on the pre-bankruptcy business decisions of the debtor’s management which, if made in good faith, are largely beyond the scope of judicial review under the business judgment rule. Though the competence of the debtor’s management may be relevant in determining the ultimate structure of the reorganized company, an assessment of blame for the company’s downfall will not contribute in a constructive manner to a balancing of the equities.

. In Re Mamie Conti Gowns, 12 F.Supp. 478 (S.D.N.Y.1935); International Brotherhood of Teamsters v. Quick Charge, 168 F.2d 513, 515-6 (10th Cir.1943).

. Since the Supreme Court has granted certio-rari in Bildisco, the trial court will, of course, be guided by the Court’s decision in that case.
Though our articulation of the applicable legal test compels a remand since we are unable to conclude that the bankruptcy court would necessarily reach the same result, Pullman Standard v. Swint, 456 U.S. 273, 291-92, 102 S.Ct. 1781,1791-2,72 L.Ed.2d 66 (1982), we feel compelled to comment that the bankruptcy court’s disposition of this case was inadequate regardless of the applicable standard. The court failed even to articulate the test on which it relied for the particular facts which supported its ultimate conclusion. The important interests of unionized employees in the continuity of a collective bargaining agreement may not be sacrificed in such a cursory manner.