**In re C. & W. MINING CO., INC., C. & W. Processing Co., Inc., C. & W. Hauling Co., Inc., Debtor.**

**Bankruptcy No. B83–00897–Y.**

United States Bankruptcy Court, N.D. Ohio.

March 20, 1984.

---

John Orr Beck, Lisbon, Ohio, Julius Zlotnick, Youngstown, Ohio, for debtor.

David Roloff, Youngstown, Ohio, Thomas M. Myers, Shadyside, Ohio, for Union.

Michael G. Gallo, Youngstown, Ohio, for Creditors' Committee.

## FINDING AS TO REJECTION
## OF CONTRACT

H.F. WHITE, Bankruptcy Judge.

This matter is before the court on the motion of the debtor, C. & W. Mining Co., Inc. (C. & W.), to reject, pursuant to 11 U.S.C. section 365(a), an executory contract with the United Mine Workers of America Local Union 1981 (Union). This executory contract is a collective bargaining agreement subject to the provisions of the National Labor Relations Act (NLRA), 29 U.S.C. section 151 et seq. The Union argues, *inter alia*, that the NLRA bars C. & W. from rejecting the bargaining agreement.

On January 25, 1984, the court conducted a hearing on C. & W.'s motion. Both parties presented testimony and exhibits and filed post-trial briefs in support of their respective positions. Based on this evidence and the record as reflected in the official court file, the court now renders its decision.

## FINDING OF FACT

1. C. & W. was incorporated under the laws of Ohio in 1969 and is the operator of a coal mine in Columbia County, Ohio.

2. On August 23, 1983, C. & W. filed a petition under Chapter 11 of the Bankruptcy Code, Title 11 U.S.C., in Youngstown, Ohio. This petition was filed in the name of C. & W. Mining Co., Inc.; C. & W. Processing Co., Inc.; and C. & W. Hauling Co., Inc. These organizations are separate legal entities, although they have in the past filed consolidated federal income tax returns. It is unclear if, and to what extent, the separate corporate form of these entities has been respected. (For the purposes of this opinion, "C. & W." refers only to C. & W. Mining Co., Inc.)

3. The Chapter 11 petition lists $10,433,-612.92 in assets and $7,667,515.18 in debts.

4. William Catlett is the president and treasurer and one of three directors of C. & W. He is also the major stockholder of C. & W., owning over 90 percent of the outstanding shares of C. & W.

5. C. & W. is also the owner of certain parcels of real property located in Florida which are not related to its coal mining

operations. These properties are valued at $2,710,000.00 and consist of a motel, apartments, and a house.

6. In 1981 C. & W., along with other coal operators and associations, entered into a collective bargaining agreement with the United Mine Workers of America. This agreement (Joint Exhibit 1), known as the National Bituminous Coal Wage Agreement of 1981 (National Agreement), sets forth in detail the hours, wages, conditions of employment, benefits, rights, duties, and responsibilities of union employees. This agreement is scheduled to remain in force until September 30, 1984.

7. On August 15, 1981, C. & W. and the Union agreed to an addendum (Joint Exhibit 2) to the National Agreement which modifies certain provisions of the National Agreement as applied to C. & W. and its employees.

8. Wages for strip mine employees under the National Agreement ranged from $11.15 to $12.53 per hour on June 7, 1981. Following periodic increases, wages would range from $13.55 to $14.93 per hour on June 7, 1984. Wages for C. & W. union employees under the terms of the addendum ranged from $7.50 to $9.50 per hour on August 15, 1981. These wages were scheduled to rise to the levels provided under the National Agreement by June 8, 1984.

9. Under the terms of the addendum C. & W. agreed to provide a guaranteed work week of no less than 36¼ hours to the forty senior union employees.

10. The National Agreement requires employers to make scheduled contributions to certain trusts and pensions for the benefit of employees. Under the terms of the addendum, C. & W. did not have to make these contributions until May 15, 1982. On June 2, 1982, the Union and C. & W. executed a second addendum to the National Agreement (Joint Exhibit 3) which provided that C. & W. did not have to make these contributions until November 15, 1982.

11. For the most part, C. & W. was a profitable enterprise. It had income of over one million dollars in 1974, 1976, and 1977. In both 1981 and 1982, however, it lost over one million dollars. C. & W. ceased all active mining operations in March 1983.

12. The court further finds, based on the testimony of C. & W.'s accountant and the report of the union's accountant (Union exhibit 4) that C. & W. was not and is not adequately capitalized. C. & W.'s cash flow problems can, in part, be attributed to the Florida property, payments on which have drained C. & W.'s working capital.

13. C. & W.'s principal customer for coal had been Ohio Edison Company, which is a public utility licensed to operate in the State of Ohio. The market for coal peaked in 1980 and then fell in 1981 and 1982. The parties agreed that the market for coal is starting to increase again. At the time it ceased operations, C. & W. was selling coal to Ohio Edison at $36.00 a ton.

14. C. & W. mined and sold good quality coal. It was generally high in B.T.U.'s and low in ash and sulfur content.

15. C. & W. has compiled a schedule of projected costs to resume operations at the mine. This schedule (Joint Exhibit 4) assumes that C. & W. can sell 16,000 tons of coal per month to Ohio Edison at $22.50 per ton at the mine or $25.00 per ton delivered. Under this schedule, C. & W. proposes to employ twenty union employees for sixty hours per week at $7.50 per hour. William Catlett, the president of C. & W., testified that this is the highest hourly wage he can afford to pay. Catlett stated that this offer is comparable to that of nonunion coal operators in and around Columbiana County.

16. The Union scheduled a series of meetings with Catlett throughout 1982 and 1983. Tony Bombico, the regional director for district 6 of the United Mine Workers of America, testified that Catlett failed to show up at some of the scheduled meetings. Mr. Bombico also testified that at a meeting in the Spring of 1982 Mr. Catlett became beligerent and threatened to open a non-union mine. In November 1982 the Union requested financial information of C.

& W. The Union did not receive this financial information until June, 1983. At a meeting in October, 1983 Catlett offered to pay $7.00 per hour with no seniority. There was no discussion of fringe benefits. The Union offered to freeze wages at the March 1983 level and to waive pension contributions. At a meeting in December, 1983, the Union offered to reduce wages by $4.00 per hour from the hourly wages scheduled in the National Agreement. The Union also offered to waive the provision in the addendum requiring a guaranteed work week for 40 men. The Union offered to extend the bargaining agreement for two years, to assist management in obtaining coal orders, and to clarify discipline procedures. The Union also requested some input into management and access to C. & W.'s financial information. Catlett agreed to seniority rights for the Union, but otherwise made essentially the same offer.

17. According to the Utility Coal Cost Report (Union exhibit 2(A)) the spot market price per ton of bituminous coal varies widely in this section of Ohio. The price ranges from almost $40.00 per ton to about $21.00 per ton. C. & W. could meet the Union's last offer if it could sell coal at $28.00 per ton.

18. William Catlett testified that the best offer he has received from Ohio Edison is $25.00 per ton. He admitted that he has not contacted other potential buyers within the C. & W. market area. He further testified that he has no contract or written understanding with Ohio Edison.

19. Catlett testified that, for most purposes, C. & W. can be compared to Ferris, a coal company operating in Columbiana County. The Utility Coal Cost Report states that Ferris sold coal to Ohio Edison's Sammis plant at $35.39 per ton on the spot market. Catlett maintained that C. & W. could not command this price because Ferris had a contract with Ohio Edison. Catlett admitted the general accuracy of the Coal Cost Report which indicated that Ferris received this price on the spot market.

20. Mr. Catlett testified that he was not anti-union. On cross-examination, how-ever, he admitted that he once told counsel for the Union that he was anti-union. Although denied by Mr. Catlett, the court finds that Catlett, on more than one occasion, threatened to file a Chapter 11 petition in order to get rid of the Union.

21. Peter J. Chestnut is a mechanic and former chairman of the Union mining committee at C. & W. He testified that Mr. Catlett told him he wanted to get rid of the Union and had offered Chestnut a foreman's job. He further testified that at a grievance committee meeting Catlett had discussed opening up a competing mine using non-union labor.

22. In approximately July 1982, Catlett started a non-union mining operation known as Magnum Coal Company. Mr. Chestnut testified that in August of 1982 a highlift, an end-loader, two bulldozers, and other equipment owned by C. & W. were transferred to Magnum. He admitted that he did not know whether Magnum paid for this equipment. He testified that C. & W.'s best equipment was transferred to Magnum. Mr. Chestnut further testified that he saw Catlett's son, who is vice-president of Magnum, remove batteries from C. & W.'s garage; the son was driving a C. & W. truck at the time.

23. Lee Kramer was an electrician for C. & W. and the financial secretary for the Union local. He testified that during 1982 C. & W. failed to pay health insurance premiums and workmen's compensation contributions. He also testified that, in August 1982, he saw a secretary in the C. & W. office write a check to pay Magnum's workmen's compensation payment. He testified that this check was drawn on a C. & W. account.

24. Mr. Catlett did not dispute the testimony of Mr. Kramer or Mr. Chestnut. Mr. Catlett did testify that both productivity and discipline had declined since C. & W. became unionized. He felt that productivity suffered because he couldn't just fire men when he wanted. He did not like the "just cause" clause in the collective bargaining agreement. He testified that he

couldn't afford to document disciplinary problems.

25. C. & W. and the Union went to arbitration three times concerning labor disputes. C. & W. lost each arbitration.

26. The parties offered conflicting testimony whether productivity improved after the mine became unionized. To some extent this conflict is explained by the different manner in which the parties measured productivity. The court finds that productivity, as measured by tons of coal produced per man-hour, did increase after the mine became unionized.

27. At the time it filed its petition, C. & W. was a party to an action for wages before the National Labor Relations Board. It was also a party to an action brought by the Union in the United States District Court.

### ISSUE

The issue in this matter is whether the court should grant C. & W.'s motion to reject its collective bargaining agreement with the Union.

### LAW

The issue in this case is simple to state, yet difficult to resolve. It requires the court to confront conflicting national policies as expressed in both the Bankruptcy Code and the NLRA. The issues of whether, and under what standard, a company in bankruptcy may be permitted to reject a collective bargaining agreement have been increasingly litigated and much publicized. The recent decision by the Supreme Court in *National Labor Relations Board v. Bildisco & Bildisco*, (Bildisco) —— U.S. ——, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) has clarified the legal issues but increased the public controversy.

The decision in *Bildisco* grants broad discretion to a debtor company, and to the bankruptcy court, in allowing the rejection of collective bargaining agreements. This discretion is not unbridled license, however; a standard has been set and limits have been posted.

C. & W.'s motion to reject its collective bargaining agreement with the Union derives its statutory source from 11 U.S.C. section 365(a) which provides:

> (a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.[1]

The language of this statute includes all executory contracts except those specifically excepted. Neither party disputes that an unexpired collective bargaining agreement is an executory contract. The dispute is mainly focused on the standard by which this court must judge C. & W.'s motion and the application of the facts of this case to said standard.

From the face of the statute, the only limitation on a trustee's rejection of an executory contract is that said rejection is "subject to the court's approval". Generally courts have conferred approval if the proposed rejection meets the "business judgment" test. *In re Chi-Feng Huang*, 23 B.R. 798 (Bkrtcy.App.Cal. 9th Cir.1982); *In re Hurricane Elkhorn Coal Corp. II*, 15 B.R. 990 (Bkrtcy.W.D.Ky.1981); *In re Marina Enterprises, Inc.*, 14 B.R. 327 (Bkrtcy.S.D.Fla.1981). This test is satisfied if the contract is in the best interest of the estate. Courts have generally required a stricter standard, however, where the contract sought to be rejected is a collective bargaining agreement.[2]

---

**1.** Section 365(a) mentions only a trustee's power to reject or assume an executory contract, but it is clear that this power extends also to a debtor-in-possession, such as C. & W., under Chapter 11. 11 U.S.C. section 1107 generally allows a debtor-in-possession to exercise the powers of a trustee in a proceeding under Chapter 11. Pursuant to 11 U.S.C. section 103, a Chapter 11 trustee may exercise the powers of a trustee

delineated in Chapter 3, including section 365, of the Bankruptcy Code. Thus, in reading the code sections together, it is clear that C. & W. stands in the shoes of the trustee.

**2.** But see, *In re Ateco Equipment, Inc.*, 18 B.R. 915 (Bkrtcy.W.D.Pa.1982) and *In re Concrete Pipe Machinery Co.*, 28 B.R. 837 (Bkrtcy.N.D. Iowa 1983) which approved the rejection of

Section 8(d) of the NLRA, 29 U.S.C. 158(d) provides, in pertinent part:

(d) Obligation to bargain collectively

For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: Provided, That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time;

collective bargaining agreements under the business judgment test. These decisions cannot be followed, however, in light of the Supreme

and

(4) continues in full force and effect, without resorting to strike or lock-out, all of the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:

The duties imposed upon employers, employees, and labor organizations by paragraphs. (2) to (4) * * * shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract. * *

This statute appears no less absolute than section 365(a) of the Bankruptcy Code. Courts have reached different results in trying to resolve the tension between these two statutes.

Some courts decided that the debtor-in-possession is a new entity distinct from the pre-petition debtor and thus not bound by either the collective bargaining agreement or section 8(d) of the NLRA. *Shopman's Local Union No. 455 v. Kevin Steel Products, Inc.*, 519 F.2d 698 (2nd Cir.1975); *Brotherhood of Railway Employees v. REA Express, Inc.*, 523 F.2d 164 (2d Cir.) cert. denied 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975); *Local Joint Executive Board, AFL–CIO v. Hotel Circle, Inc.*, 613 F.2d 210 (9th Cir.1980); *In re Bildisco*, 682 F.2d 72 (3d Cir.1982). The "new entity" theory was criticized by other courts. *In re Brada Miller Freight System, Inc.*, 702 F.2d 890 (11th Cir.1983); *In re Price Chopper Supermarkets, Inc.*, 19 B.R. 462 (Bkrtcy.S.D.Cal.1982); *International Union v. Miles Machinery Co.*, 34 B.R. 683 (E.D.Mich.1982). See also Bordewieck and Countryman, *The Rejection of Collective Bargaining Agreements by Chapter 11 Debtors*, 57 Am.Bankr.L.J. 293 (1983).

Court decision in *Bildisco, supra.,* discussed infra.

The Union devoted a considerable portion of its post-trial brief arguing against the "new entity" theory. After the briefs were filed the Supreme Court announced its decision in *Bildisco*. The court held:

> For our purposes, it is sensible to view the debtor-in-possession as the same 'entity' which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have done absent the bankruptcy filing.

This decision clearly rejects the "new entity" theory. This court is bound by that decision; no further discussion is necessary.

■ The Union has also argued in its brief that this court should permit C. & W. to reject the collective bargaining agreement only if C. & W. can show that its reorganization will fail without rejection. The Supreme Court, in *Bildisco*, has ruled that such a standard is too strict. The proper standard is "that the Bankruptcy Court should permit rejection of a collective bargaining agreement under section 365(a) of the Bankruptcy Code if the debtor can show that the collective bargaining agreement burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract." *Bildisco*, ── U.S. at ──, 104 S.Ct. at 1196. This is the standard to be applied to the facts of this case.

■ In balancing the equities, the bankruptcy court must necessarily consider the facts and circumstances of each case. It must consider the possibility of liquidation, both with and without rejection of the contract. It must also consider the import of liquidation on each of the parties involved. The bankruptcy court must also consider the claims of employees that will result from rejection and the impact on claims of creditors if rejection is not allowed. The court should also consider the possibility of a strike if rejection is approved. Another factor is the cost-spreading abilities of the parties.

In addition to the above factors, most courts also consider the good or bad faith of the parties in seeking to resolve their differences. *In re Brada Miller Freight Systems, Inc., supra.; In re Bildisco*, 682 F.2d 72 (3d Cir.1982); *Shopman's Local Union No. 455 v. Kevin Steel Products, Inc.; supra.* The importance of this factor is stressed in *Brada Miller, Supra.*, 702 F.2d at 901:

> Therefore, regardless of the outcome of the balancing of the equities, a bankruptcy court must make an 'explicit showing in the record that the debtors were not improperly motivated by a desire to rid themselves of the union' prior to allowing the rejection of a collective bargaining agreement. (Citations omitted)

The Supreme Court's decision in *Bildisco* does not specifically mention this as one factor. In fact, it can be argued that, under *Bildisco*, the question of good or bad faith is not relevant to the issue of rejection. At one point the court states:

> The Bankruptcy Court is a court of equity, and in making this determination it is in a very real sense balancing the equities, as the Court of Appeals suggested. Nevertheless, the Bankruptcy Court must focus on the ultimate goal of Chapter 11 when considering these equities. The Bankruptcy Code does not authorize free-wheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization. The Bankruptcy Court's inquiry is of necessity speculative and it must have great latitude to consider any type of evidence relevant to this issue. ── U.S. at ──, 104 S.Ct. at 1197.

This raises the question of whether the good or bad faith of the parties is a factor which properly relates "to the success of the reorganization". This court concludes that it is a proper factor to be considered when balancing the equities.

The success of C. & W.'s reorganization depends, to a large extent, on the motivation and good will of the employees. The debtor's bad faith can destroy this psycho-

logical component. Production could decline; employees might strike. The court might harm the chance of a successful reorganization if it permits rejection in the wake of egregious bad faith.

Furthermore, the court's opinion in *Bildisco* implicitly supports considering the good or bad faith of the parties. The court states:

> Before acting on a petition to modify or reject a collective-bargaining agreement, however, the Bankruptcy Court should be persuaded that reasonable efforts to negotiate a voluntary modification have been made and are not likely to produce a prompt and satisfactory solution. The NLRA requires no less. Not only is the debtor-in-possession under a duty to bargain with the union under § 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5), see post, at 18–19, but the national labor policies of avoiding labor strife and encouraging collective bargaining, id., § 1, 29 U.S.C. § 151, generally require that employers and unions reach their own agreements on terms and conditions of employment free from governmental interference. See, *e.g., Howard Johnson Co. v. Hotel Employees,* 417 U.S. 249 [94 S.Ct. 2236, 41 L.Ed.2d 46] (1974); *NLRB v. Burns Security Services,* 406 U.S. 272, 282–294 [92 S.Ct. 1571, 1579–1585, 32 L.Ed.2d 61] (1972).

at ——, 104 S.Ct. at 1196.

"Reasonable efforts to negotiate a voluntary modification" require bargaining in good faith by both parties. Reasonableness requires that the union accept sacrifices in order to reorganize the business. It does not require the union's surrender to the debtor's bad faith demands.

■ The Court finds that the Union did, in good faith, try to resolve its differences with C. & W. In 1981 when the National Agreement was signed, the Union agreed to reduce its wages and to waive payments into the pension and benefit trusts. After C. & W. ceased operations, the Union offered to freeze wages. Later they offered to reduce wages and to waive the guaranteed work provision contained in the addendum. The Union even offered to help C. & W. obtain orders for coal. It appears to this court that the Union has earnestly bargained in good faith. The Union appreciates the financial hardship of the debtor and is willing to sacrifice.

C. & W., and its principal, William Catlett, on the other hand, have failed to make a good faith effort to bargain with the Union. Catlett admitted on cross-examination, after denying it on direct examination, that he was anti-union. On more than one occasion he threatened to bust the Union by filing a Chapter 11 petition.

Catlett's bad faith extends beyond words, however, and into action. Catlett also started a non-union coal mine to compete with C. & W. This fact, by itself, is not too disturbing; our free enterprise system encourages the formation of new enterprises. That Catlett stripped C. & W. of some of its best equipment and transferred it to Magnum and that he paid Magnum obligations with C. & W. funds is most disturbing to this court. The court questions Catlett's motives in starting Magnum, a non-union company.

It is problematical whether this collective bargaining agreement is burdensome. Any measure of burdensomeness is relative. It must be measured against alternatives. Obviously, if C. & W. can only pay its employees reduced wages and operate successfully by rejection of the collective bargaining agreement, then the contract would be considered burdensome. But even if the contract is rejected, C. & W. must still bargain with the union. *Bildisco, supra.; In re Brada Miller Freight System, Inc., supra.* If a subsequent agreement is not reached, a strike could result. If this were the result, then, with the wisdom of hindsight, the contract may not have seemed so burdensome.

As *Bildisco* reminds us, the bankruptcy court is a court of equity. It provides a safe haven and a fresh start for the honest debtor. Neither C. & W. nor William Catlett have been honest with the Union. Catlett threatened the Union, missed scheduled meetings, and delayed in giving requested

financial information. For the most part, Catlett's testimony before this court was self-serving and less than credible. His surprising candor in admitting his anti-union bias upon cross-examination only serves to underscore his bad faith. Accordingly, the court must deny the motion of C. & W. to reject its collective bargaining agreement with the Union.

The court is cognizant that this decision may increase the possibility of liquidation. A liquidation would be most harmful to the business creditors as at this time the Union employees have not worked since March 1983. However, the Union has bargained in good faith even up to the time of this hearing and they certainly have an economic incentive to bargain again in good faith.

Today's decision does not necessarily mean that a successful reorganization is impossible. The parties are encouraged to attempt a new round of bargaining discussions. As mentioned above, even if the contract were rejected, they would still have a duty to bargain in good faith. *Bildisco, supra.; In re Brada Miller Freight System, Inc. supra.*

The court also finds that today's decision does not necessarily prejudice the creditors of C. & W. The court notes that C. & W.'s schedules indicate a positive net worth. Thus, if reorganization is not possible, they should receive a substantial percentage of their claims in liquidation. If reorganization is successful, the union employees might receive wages higher than those last offered by Mr. Catlett. This could in turn reduce the amount, or lengthen the time, of payment on the creditors' claims. This possibility is offset, however, by the fact that

rejection would, under 11 U.S.C. section 365(g)(1), be a breach of the collective bargaining agreement resulting in unsecured claims for the Union members.[3] On balance, the court finds that the interests of the creditors do not outweigh the equities in favor of the Union.

Finally, the court stresses that today's decision is limited. The court's discussion of bad faith, relates solely to the issue, under section 365(a) concerning C. & W.'s motion to reject its contract with the Union. The court notes that, at the time the petition was filed, C. & W. and the Union were parties to labor-related actions in the district court and before the National Labor Relations Board. The court expresses no opinion on the merits of those actions. The court has tried to stay within the field of its expertise and its decision is grounded solely in bankruptcy law.

Today's decision is also limited to the facts of this case. Each reorganization presents its own peculiar facts. Bad faith can assume many different forms. The court announces no broad principles; rather it holds that, under the facts of this case, the equities balance in favor of the Union's position and that C. & W.'s motion to reject the contract must be denied.

### ORDER DENYING MOTION TO REJECT CONTRACT

Based upon the Finding as entered by this Court on the 20th day of March 1984,

IT IS ORDERED that the motion of the debtor to reject the executory contract with the United Mine Workers of America Local Union 1981 is hereby denied.

---

**3.** 11 U.S.C. Section 365(g)(1) provides as follows:

"Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—

(1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, or 13 of this title, immediately before the date of the filing of the petition; ..."

Claims resulting from rejection are then determined under 11 U.S.C. section 502(g), which provides:

"A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition."